UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KENALL MANUFACTURING COMPANY, | ) |
| | ) |
| Plaintiff, | ) 17 C 4575 |
| | ) |
| vs. | ) Judge Gary Feinerman |
| | ) |
| COOPER LIGHTING, LLC, and EATON CORPORATION, | ) |
| | ) |
| Defendants. | ) |

**M<sub>EMORANDUM</sub> O<sub>PINION AND</sub> O<sub>RDER</sub>**

Kenall Manufacturing Company brings this suit against Cooper Lighting, LLC and Eaton Corporation, alleging patent infringement and breach of contract. Doc. 1. The parties have cross-moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Docs. 35, 45, 48, 51, 54. Kenall seeks judgment on all its claims, while Defendants seek judgment only on Kenall's patent claims. Kenall's motion is denied without prejudice to renewal after Defendants replead their affirmative defenses, and Defendants' motion is granted in part and denied in part.

**Background**

The court reviews a Rule 12(c) motion under the same standard as a Rule 12(b)(6) motion. *See Guise v. BWM Mortg., LLC*, 377 F.3d 795, 798 (7th Cir. 2004). The court may consider "the complaint, the answer, and any written instruments attached as exhibits." *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998). Because the court will partially grant Cooper's motion and deny Kenall's motion, the facts are set forth in the light most favorable to Kenall. *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014).

1

Kenall and Cooper are competing commercial lighting manufacturers. Doc. 1 at ¶¶ 19-20. In 2012, Eaton acquired Cooper, which operates as "Eaton's Lighting Division." *Id*. at ¶ 6. For ease of reference, and because Eaton may be ignored for purposes of the present motions, Eaton and Cooper are referred to together as "Cooper."

Kenall holds several patents. The first, U.S. Patent No. 6,984,055 ("the '055 patent"), issued on January 10, 2006, covers a "modular lighting fixture adaptable for being implemented in various shapes and configurations." Doc. 1-2 at 11; Doc. 1 at ¶ 21. Kenall's Millennium Stretch lighting products are based on the patented technology. Doc. 1 at ¶ 23. In 2004, while Kenall's first patent application was pending, Cooper discussed with Kenall the possibility of licensing Kenall's technology, but did not enter into a license at that time. *Id*. at ¶ 25. In February 2005, Cooper launched its Fail-Safe Harmony VR Linear Series lighting fixtures, which Kenall believed infringed its patent. *Id*. at ¶ 26. On January 16, 2006, Kenall informed Cooper that its patent had issued days earlier. *Id*. at ¶¶ 21, 27.

Just over a year later, Kenall filed a patent infringement suit against Cooper. *See Kenall Mfg. Co. v. Cooper Lighting, Inc.*, No. 07 C 603 (N.D. Ill. filed Jan. 31, 2007). The parties resolved the suit pursuant to a Settlement Agreement and Confidential License Agreement. Doc. 1 at ¶ 29. The Settlement Agreement provided that, "[s]ubject to full compliance by Cooper with this Agreement and with the terms of the Confidential License Agreement, Kenall waives … its claims against Cooper for patent infringement damages with respect to manufacture and sale occurring before the date of this Agreement." Doc. 1-1 at p. 3.

In the License Agreement, Kenall granted Cooper "a world-wide, nonexclusive license," "[s]ubject to the terms, conditions and limitations in this Agreement," to manufacture and sell Cooper's "Linear Continuous" and "Linear Single" products—which the Agreement refers to as

2

the "Subject Continuous Products" and "Subject Single Products," respectively, and together as the "Subject Products"—within the scope of the '055 patent and any patents stemming therefrom (the "Subject Patents"). *Id*. at pp. 35-36, § 1. In return, Cooper agreed to place a patent notice on every licensed product starting no later than December 31, 2007; to make a one-time payment of $30,000 within seven days of executing the Agreement; and to make quarterly royalty payments of five percent of net sales of the Subject Continuous Products starting on January 1, 2008 and continuing through the expiration of the last Subject Patent. *Id*. at pp. 37-39, §§ 5.A, 5.B, 9. Cooper also agreed to redesign its Subject Single Product "to have a one-piece end unit instead of the current two-piece end unit, such redesigned product being referred to … as the 'Re-Designed Single Product,'" by January 1, 2008. *Id*. at p. 36, § 2. If Cooper needed additional time for the redesign, it could continue to sell the Subject Single Product until April 1, 2008, subject to a five percent royalty. *Id*. at pp. 36-37, §§ 2, 5.C.

The License Agreement further provided that, in the event of a breach by Cooper, Kenall could terminate the license "by a one-month written notice specifying such breach; however, termination can be avoided if within the notice period Cooper takes reasonable steps to remedy the breach." *Id*. at p. 40, § 12. The Agreement included a "No Challenge Clause," which provided that, although "Cooper does not admit infringement, validity or enforceability of the Subject Patents, and reserves all defenses to any allegation of infringement … [,] Cooper shall refrain from contesting the validity, enforceability, or infringement of the Subject Patents in any court of law or other forum unless Kenall asserts the Subject Patents against Cooper products other than the Subject Products." *Id*. at pp. 41-42, § 15. The Agreement also included an Illinois choice-of-law provision. *Id*. at p. 41, § 14.

Kenall filed this suit in June 2017, alleging that Cooper had failed to make royalty payments, had not placed the required patent notices on its products, had not redesigned the Subject Single Product to have a one-piece end unit, and continued to sell the Subject Single Product with a two-piece end unit at least until mid-2016. Doc. 1 at ¶¶ 48-53. Kenall claims that Cooper's actions breached the License Agreement, and also that Cooper's unauthorized sale of Subject Products infringed the Subject Patents.

## Discussion

### I. Cooper's Motion for Judgment on the Patent Claims

The holder of a valid U.S. patent may "exclude others from making, using, … or selling [its] invention throughout the United States or importing the invention into the United States" by suing for infringement. 35 U.S.C. § 154(a). A nonexclusive license such as the License Agreement between Kenall and Cooper is a promise by the patent holder not to exercise that right by suing the licensee. *See U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1189 (Fed. Cir. 2005) ("A nonexclusive patent license is simply a promise not to sue for infringement.").

Cooper argues that Kenall, by giving Cooper a "worldwide, nonexclusive license" to manufacture and sell the Subject Products, relinquished its right to sue Cooper for patent infringement. Doc. 42 at 1-2. Insofar as Cooper has failed to abide by the license's terms, Cooper contends, Kenall's only remedy lies in a breach of contract suit, not a patent infringement suit. *Id*. at 1.

Kenall responds that that the License Agreement's "No Challenge Clause" prevents Cooper from "rais[ing] a defense against Kenall's infringement count." Doc. 69 at p. 13, ¶ 41. That particular argument is far-fetched, as the No Challenge Clause cannot possibly prevent

Cooper from raising the license itself as a defense to a patent infringement claim.  Cooper must be permitted to argue that its allegedly infringing conduct is authorized by the license, else the license—which is, at bottom, a promise not to sue for infringement—would be illusory.  *See Keefe v. Allied Home Mortg. Corp.*, 912 N.E.2d 310, 314 (Ill. App. 2009) ("An illusory promise is … defined as one in which the performance is optional [and] is not sufficient consideration to support a contract.") (citations and internal quotation marks omitted); *First Bank & Trust Co. of Ill. v. Vill. of Orland Hills*, 787 N.E.2d 300, 305 (Ill. App. 2003) ("A court will not interpret an agreement in a way that would nullify its provisions or render them meaningless.").

Kenall's more serious argument is that because the license was "[s]ubject to the terms, conditions and limitations in this Agreement" and Cooper violated those terms, all associated sales of the Subject Products were outside the license's scope.  Doc. 69 at pp. 9-13, ¶¶ 28-40.  A license "is about changing the contours of the patentee's monopoly." *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1534 (2017).  If it wishes, a patent holder "is free to relinquish only a portion of its bundle of patent protections" by placing certain limits on the license.  *Ibid*.  If the licensee makes sales that exceed those limitations, those sales are outside the scope of the license and therefore unauthorized.  The effect of such sales "is precisely the same as if no license whatsoever had been granted," meaning that the licensor may bring a patent infringement suit based on the unlicensed sales.  *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 305 U.S. 124, 127 (1938).

The parties have thus staked out diametrically opposed positions.  According to Cooper, *no* breach of the License Agreement can take a sale of a licensed product outside the scope of the license and give rise to an infringement action.  According to Kenall, *any* breach of the Agreement takes related sales outside of the scope of the license and therefore gives rise to an

infringement suit. As explained immediately below, both all-or-nothing positions are incorrect; rather, to determine which of Cooper's alleged breaches can give rise to a patent infringement claim and which can give rise to a contract claim only, the court must assess each breach individually to assess "whether the terms [Cooper] allegedly breached were limitations on the scope of the license, which would mean that [Cooper] had infringed the [patent] by acting outside the scope of the license; or whether the terms were merely separate contractual covenants, which would make this a contract dispute." *Sun Microsys., Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999) (California law), *overruling on other grounds recognized by Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 979 (9th Cir. 2011).

To support its view that no term of the License Agreement limits its license, Cooper observes that the Agreement's first section, labeled "License Grant," gives it a "worldwide, nonexclusive license" and includes no restrictions whatsoever. Doc. 1-1 at p. 36; Doc. 75 at 6. On Cooper's reading, the Agreement's subsequent terms governing its conduct impose contractual obligations only and do not narrow the license's scope. That reading is incorrect. The License Grant specifies that the "worldwide, nonexclusive license" is "[s]ubject to the … limitations in this Agreement," indicating that the Agreement's other sections may limit the license's scope. And even without that qualifying language, whether a license provision narrows license scope, as opposed to imposing only a contractual obligation, does not and cannot turn on the fortuity of the paragraph in which it appears. A provision in the middle of an agreement stating that "the license does not extend outside Illinois" limits license scope no less than if it appeared in the opening section titled "License Grant." Thus, the court must look at the entirety of the Agreement, and not just to the License Grant provision, to determine the license's scope.

6

For its part, Kenall maintains that any deviation from the terms of the License Agreement abrogates the license and gives rise to an infringement action. The parties to a license are free to condition the license on any terms they wish. *See* Raymond T. Nimmer & Jeff C. Dodd, *Modern Licensing Law* § 11:4 (2017) ("[I]f the parties are clear that the continued exercise of rights under a license is subject to a condition … the courts will respect that expressed intention."); *Jacobsen v. Katzer*, 535 F.3d 1373, 1382 (Fed. Cir. 2008) (holding that a software license was expressly conditioned on the licensee including copyright notices in distributed copies of its software). And if a licensee violates a license condition, then the license is nullified and the patent holder may sue for infringement. *See* Nimmer & Dodd, *supra*, § 11:3 ("[I]f a condition to a party's duty has not occurred, that party need not perform its subsequent performance."). But Illinois law, which governs the Agreement, directs courts charged with determining whether a license term is a condition or merely a contractual promise that "where it is doubtful whether [an] agreement was intended by the parties to be a condition precedent or an independent covenant … , courts will construe it as an independent covenant." *Freet v. Am. Elec. Supply Co.*, 152 Ill. App. 205, 208 (1909); *see also Graham v. James*, 144 F.3d 229, 236-37 (2d Cir. 1998) (New York law) (applying that interpretive rule and determining that certain terms in a license agreement were independent covenants not affecting license scope). That presumption is especially strong when reading a term as a condition would "allow[] a substantial loss to be visited on a party for a small defalcation." Nimmer & Dodd, *supra*, § 11:4.

The fact that the License Agreement provides that Cooper's license is "[s]ubject to the [Agreement's] terms, conditions, and limitations" does not overcome the presumption in favor of covenants over conditions. Three features of the Agreement support this conclusion. First, the separate enumeration of "terms, conditions, *and* limitations" (emphasis added) in the License

7

Grant provision strongly suggests that not *every* term in the Agreement is a condition of the license or limitation on its scope whose violation gives rise to an infringement suit. Second, saying that the license is "subject to" the terms of the Agreement is very different from saying that the license is "conditioned on" those terms. The former states the obvious—that, by entering into the Agreement, Cooper agreed to abide by its terms—while the latter says that the license is effective only if certain conditions are satisfied. Third, interpreting the license as conditioned on every term of the Agreement would render superfluous its termination clause, which provides that "[i]n the event of breach of this Agreement by Cooper, Kenall may terminate the license … by a one-month written notice specifying such breach; however, termination can be avoided if within the notice period Cooper takes reasonable steps to remedy the breach." Doc. 1-1 at p. 40, § 12. If *any* failure by Cooper to comply with the Agreement's "terms, conditions and limitations" automatically terminated the license, giving rise to an infringement claim, the termination clause would serve no purpose. Illinois law counsels against such an interpretation. *See Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014) (noting that "whenever possible we attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous"); *Babbitt Municipalities, Inc. v. Health Care Serv. Grp.*, 64 N.E.3d 1178, 1188 (Ill. App. 2016) ("[A] contract should be construed, if possible, so that no clause or sentence is rendered superfluous.") (alterations and internal quotation marks omitted); *see also Sun Microsys., Inc. v. Microsoft Corp.*, 81 F. Supp. 2d 1026, 1033 (N.D. Cal. 2000) (California law) ("If Sun could sue for copyright infringement immediately upon Microsoft's failure to fully meet [contractual] requirements, the remedies scheme would be frustrated and Microsoft would not get the full benefit of its bargained for cure periods.").

Although Kenall is wrong to assert that *all* terms of the License Agreement limit license scope, *some* of them might. As noted, when a patent holder restricts the scope of a license, it retains "a portion of its bundle of patent protections." *Impression Prods.*, 137 S. Ct. at 1534. A licensor therefore may limit the scope of a license, carving out a portion of the monopoly that it will retain, by reserving its exclusive right to make certain sales. For example, a licensor may authorize sales of a product covered by its patent only for a particular purpose, *see Gen. Talking Pictures Corp.*, 305 U.S. at 127 (affirming a judgment of infringement where the licensee, "knowing that it had not been licensed to manufacture or to sell amplifiers for use in theaters," made and sold amplifiers for that use); in a particular area, *see Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1275 (Fed. Cir. 2007) ("[T]he license includes both geographic … and field of use … restrictions."); or for a particular time period, *see Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp. 3d 565, 581 (S.D.N.Y. 2016) (holding that the defendant's use of an image after the license expired infringed the plaintiff's copyright).

In short, the patent holder can delineate license scope by restricting the "who, what, when, and where" of authorized sales. If a contractual term limits the set of licensed sales, then it restricts the scope of the license regardless of whether it is phrased as a limit on the license grant or a promise not to make certain sales. There is no meaningful difference between (1) a contract that grants "a license to sell Product X in Illinois" and (2) a contract that grants "a license to sell Product X" and later provides that "the licensee promises not to sell Product X outside Illinois." The second contract, no less than the first, makes clear that the license authorizes sales only in Illinois. *See Shaw v. E.I. DuPont De Nemours & Co.*, 226 A.2d 903, 906 (Vt. 1966) (Vermont law) ("[I]n a restricted license of patent rights … the licensee [impliedly promises] not [to] invade the ungranted part of the patent to the detriment of the estate reserved

9

by the licensor."). It would be pure formalism to insist that a mere difference in phrasing determines whether a licensor has an infringement remedy in addition to a contract remedy. In either case, the license authorizes certain sales and not others; and in either case, unauthorized sales are outside of the license's scope and can support an infringement action.

By contrast, many terms in a license agreement have nothing to do with the "who, what, when, and where" of authorized sales; that is, they do not protect the patent holder's exclusive rights by providing that the license authorizes only certain categories of sales. Consider, for example, the License Agreement's recordkeeping provision, which provides that "Cooper shall keep … books and records sufficient to ascertain and verify the Net Sales of Licensed Products" for "a period of two [] years after each calendar quarter." Doc. 1-1 at p. 38, § 7. Covenants such as these, which do not determine what sales are authorized and thus have nothing to do with the patent holder's exclusive rights, do not limit license scope.

With these parameters set, the court will examine each License Agreement provision allegedly breached by Cooper and determine whether the alleged breach can support a patent infringement claim or, rather, only a breach of contract claim.

### A. Failure to Place Patent Notices on Licensed Products

Kenall alleges that Cooper never placed patent-notice labels on any of the licensed products, in violation of § 9 of the License Agreement, Doc. 1 at ¶ 51, which provides that "[c]ommencing no later than December 31, 2007, Cooper shall place the following patent notice on every Licensed Product: 'Licensed under Kenall U.S. Patent No. 6,984,055,'" Doc. 1-1 at p. 39. Cooper's noncompliance may give rise to a contract claim, but its failure to place a patent-notice label on the licensed products it sold did not take those sales outside the scope of the license and thus did not infringe Kenall's patents.

As noted, a provision restricts license scope when it reserves for the licensor the right to make a certain category or categories of sales. The presence or absence of the patent notice does not define a category of sales because it does not affect the "who, what, when, and where" of a sale. The notice is simply a label that is supposed to be affixed to products that Cooper otherwise had a license to sell. This (literally) superficial addition does not change the nature of the product being sold. Cooper's obligation to place patent notices on the Licensed Products is a pure creature of contract that has nothing to do with Kenall's exclusive rights under the patent. *Cf. MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 941 (9th Cir. 2010) ("Although this conduct may violate the contractual covenants with [the licensor], it would not violate any of [the licensor's] exclusive rights of copyright."); *Graham*, 144 F.3d at 236 (holding that the licensor was limited to a contract remedy for violation of a notice requirement). Kenall therefore may not base any patent infringement claim on Cooper's alleged violation of the notice requirement.

### B. Failure to Pay Royalties

Kenall alleges that Cooper has failed to make many of the royalty payments required by the License Agreement. Doc. 1 at ¶¶ 49, 50, 53. Like the notice requirement, Cooper's obligation to pay certain sums as royalties at particular times is a creature of contract. The royalty requirement does not limit the set of sales that Cooper is authorized to make, so Kenall's remedy for nonpayment is in a breach of contract action, not a patent infringement suit. *See Royal v. Leading Edge Prods., Inc.*, 833 F.2d 1, 3 (1st Cir. 1987) ("[I]f the royalty agreement stands, then the plaintiff's sole remedy for the breach of it would be money damages—and the Copyright Act need not be construed."); *Actuate Corp. v. Fid. Nat'l Info. Servs., Inc.*, 2014 WL 4182093, at *3 ("Relying [on *MDY Industries*], courts in this circuit have … reject[ed] [claims for copyright infringement] where the gravamen of the complaint was a failure to remit sufficient

royalties."); *cf. Graham*, 144 F.3d at 236 (holding that the licensor was limited to a contract remedy for violating royalty terms).

### C. Sales of Subject Single Products After April 1, 2008

Kenall alleges that Cooper continued to sell Subject Single Products after April 1, 2008 and that those sales were outside the license's scope. Doc. 1 at ¶ 48. No single provision in the License Agreement expressly obligated Cooper to cease selling the Subject Single Products by April 1, 2008, but reading the Agreement as whole, it is clear that the license for those products expired on that date.

The Agreement provides: "By January 1, 2008, Cooper shall re-design the Subject Single Product to have a one-piece end unit instead of the current two-piece end unit, such redesigned product being referred to … as the 'Re-Designed Single Product.'" Doc. 1-1 at p. 36, § 2. If Cooper needed extra time for the redesign, it could "continue selling Subject Single Products for the period January 1, 2008 through April 1, 2008 (the 'Re-Design Extension Period'), subject to a running royalty for sales beginning January 1, 2008 as set forth below." *Id*. at pp. 36-37, § 2. The Agreement refers to that royalty as a "one-time royalty payment" for "Subject Single Products sold by Cooper during the Extension Period of January 1, 2008 through April 1, 2008, such royalty payment being due May 1, 2008." *Id*. at p. 37, § 5.C.

The extension period ends on April 1, 2008, and the Agreement makes no provision for sales after that date. Compare that time restriction and corresponding "one-time royalty payment" with the royalty terms for the Subject Continuous Products, which required Cooper to start paying a quarterly royalty on January 1, 2008 and to continue doing so "until expiration of the last-to-expire of the Subject Patents." Doc. 1-1 at p. 37, § 5.B. The only conclusion to be

drawn from these provisions is that Cooper's license to sell Subject Single Products was temporary and expired on April 1, 2008, by which date the redesign was to have occurred.

Kenall therefore retained the exclusive right to sell Subject Single Products after April 1, 2008. In selling Subject Single Products after that date, Cooper "invade[d] the ungranted part of the patent to the detriment of the estate reserved by [Kenall]," and thereby exceeded the license's scope. *Shaw*, 226 A.2d at 906. All sales of Subject Single Products after April 1, 2008 were unauthorized and therefore are subject to an infringement claim. *See Palmer/Kane*, 204 F. Supp. 3d at 581 (holding that the defendant's use of an image after the license expired infringed the plaintiff's copyright); Nimmer & Dodd, *supra*, § 11:32 ("A licensee that uses the licensed subject matter after the license ends infringes the relevant intellectual property rights … .").

### D. Failure to Redesign the Subject Single Product

Kenall alleges that Cooper, in addition to continuing to sell Subject Single Products after April 1, 2008, separately violated the License Agreement by failing to redesign the product to have a one-piece end unit before April 1, 2008. Doc. 1 at ¶ 52. Those two violations are distinct if Cooper was obligated not only to stop selling Subject Single Products with the two-piece end unit after April 1, 2008, but also to redesign and sell the Re-Designed Single Product with the one-piece end unit.

Assuming for present purposes that the Agreement did in fact impose a redesign requirement on Cooper, that requirement would not affect the license's scope. As noted, a provision restricts license scope when it reserves for the licensor the right to make a certain category of sales, thereby obligating the licensee *not* to make such sales. *See Shaw*, 226 A.2d at 906. The redesign requirement, by contrast, allegedly required Cooper *to* make certain sales. That affirmative obligation is a pure creature of contract, bearing no relation to Kenall's

exclusive rights as a patent holder. Kenall may not pursue infringement claims based on any alleged violations of the redesign requirement.

## II. Kenall's Motion for Judgment on All Claims

Kenall has moved for judgment on the pleadings on all its claims, arguing that Cooper admitted to breaching the License Agreement. Docs. 45, 48, 51, 54. Kenall's motion is premature. Cooper asserted several affirmative defenses, Doc. 20 at ¶¶ 89-93, which Kenall then moved to strike, Doc. 59. Cooper did not oppose Kenall's motion, which the court granted on the understanding that Cooper could amend its answer to reassert the defenses after the court resolved the contract-versus-patent issue. Doc. 67.

Judgment on the pleadings is appropriate only "[a]fter the pleadings are closed." Fed. R. Civ. P. 12(c). Because the pleadings remain open at least as to Cooper's affirmative defenses, Kenall's motion for judgment on the pleadings is denied without prejudice.

## Conclusion

Cooper's motion for judgment on the pleadings is granted in part and denied in part. Kenall's patent claims are dismissed except insofar as they pertain to Subject Single Products that Cooper sold after April 1, 2008. Kenall's motion for judgment on the pleadings is denied without prejudice to renewal after Cooper pleads its affirmative defenses. Cooper has until July 13, 2018 to replead its affirmative defenses.

June 20, 2018

United States District Judge