**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KENALL MANUFACTURING COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-4575 |
| | ) | |
| v. | ) | Judge Gary Feinerman |
| | ) | |
| COOPER LIGHTING, LLC and EATON CORPORATION, | ) | **REDACTED** |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE**
**IN WHOLE OR IN PART PLAINTIFF'S EXPERT TESTIMONY**

# TABLE OF CONTENTS

**Page**


INTRODUCTION ..... 1

BACKGROUND ..... 2

APPLICABLE LEGAL STANDARDS ..... 5

ARGUMENT ..... 8

I. PLAINTIFF'S TECHNICAL EXPERT, FRANK REID, DID NOT EVALUATE THE SCOPE OF THE PATENTS-IN-SUIT AND THUS CANNOT OPINE ON THE POSSIBILITY OF ALTERNATIVES TO THE CLAIMED INVENTION, HENCE HIS TESTIMONY SHOULD BE EXCLUDED. ..... 8

II. PLAINTIFF'S MARKET EXPERT, BRIAN GOLDEN, DID NOT EVALUATE THE SCOPE OF THE PATENTS-IN-SUIT AND THEREBY DID NOT ASSESS THE RELEVANT MARKET DEMAND, HENCE HIS TESTIMONY SHOULD BE EXCLUDED. ..... 10

III. PLAINTIFF'S DAMAGES EXPERT, MELISSA BENNIS', TESTIMONY SHOULD BE EXCLUDED. ..... 12

A. BENNIS' RELIANCE ON GOLDEN AND REID DOOMS HER LOST PROFITS ANALYSIS. ..... 13

B. BENNIS' ROYALTY RATE CANNOT STAND AS IT IS WHOLLY UNSUPPORTED AND THREE TIMES GREATER THAN THE CURRENT ROYALTY ENJOYED BY COOPER FOR ACCESS TO THE VERY SAME PATENTS-IN-SUIT. ..... 13

C. BENNIS' ROYALTY BASE ALSO IS IMPROPERLY INFLATED BECAUSE SHE FAILED TO APPORTION. ..... 16

D. BENNIS' BREACH OF CONTRACT DAMAGES CALCULATION IS IMPROPER. ..... 18

E. RESTITUTION IS, BY BENNIS' OWN ADMISSION, AND UNDER THE LAW, AN IMPROPER DAMAGES CALCULATION AND SHOULD BE STRICKEN. ..... 19

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple v. Inc v. Samsung Electronics Co., Ltd.*
2012 WL 3155574 (N.D. Cal. Aug. 2, 2012) .......... 20

*Brandeis Univ. v. Keebler Co.*,
2013 WL 5911233 (N.D. Ill. Jan. 18, 2013) .......... 12

*CSIRO v. Cisco Sys.*,
809 F.3d 1295 (Fed. Cir. 2015) .......... 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... *passim*

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018) .......... 15, 16

*Gayton v. McCoy*,
593 F.3d 610 (7th Cir. 2010) .......... 5

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997) .......... 18

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) .......... *passim*

*Good Tech. Corp. v. Mobileiron, Inc.*,
2015 WL 4090431 (N.D. Cal. July 5, 2015) .......... 12

*Guardant Health, Inc. v. Found. Med., Inc.*,
2020 WL 2461551 (D. Del. May 7, 2020) .......... 13

*King Instruments Corp. v. Perego*,
65 F.3d 941 (Fed. Cir. 1995) .......... 7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 6

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .......... 17

*Martin v. Barber*,
755 F.2d 1564 (Fed. Cir. 1985) .......... 8

*Martin v. F.E. Moran, Inc.*,
2017 WL 1105388 (N.D. Ill. Mar. 24, 2017) .......... 5, 6

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017) .......... 7, 9

*Minks v. Polaris Indus. Inc.*,
546 F.3d 1364 (Fed. Cir. 2008) .......... 6

*NeuroGrafix v. Brainlab, Inc.*,
No. 12 C 6075, 2021 WL 1057312 (N.D. Ill. Mar. 18, 2021) .......... 20

*Pall Corp. v. Micron Separations, Inc.*,
66 F.3d 1211 (Fed. Cir. 1995) .......... 7

*Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*,
575 F.2d 1152 (6th Cir. 1978) .......... *passim*

*Plestsov v. GTS Transportation Corp.*,
No. 20 CV 1847, 2021 WL 534666 (N.D. Ill. Feb. 12, 2021) .......... 20

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
904 F.3d 965 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1265 (2019) .......... 16

*Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*,
525 F.3d 533 (7th Cir. 2008) .......... 20

*Santorini Cab Corp. v. Banco Popular N. Am.*,
999 N.E.2d 46 (IL App (1st) 2013) .......... 19, 20

*Seaboard Lumber Co. v. United States*,
308 F.3d 1283 (Fed. Cir. 2002) .......... 15

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) .......... 5

*Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*,
926 F.2d 1161 (Fed. Cir. 1991) .......... 7

*Teradata Corp. v. SAP SE*,
570 F. Supp. 3d 810 (N.D. Cal. 2021) .......... 10

*Tillman v. U.S. Energy Sav. Corp.*,
No. 08 C 1641, 2008 WL 2754813 (N.D. Ill. July 14, 2008) .......... 20

*Trading Techs. Int'l, Inc. v. IBG LLC*,
No. 10 C 715, 2021 WL 5038755 (N.D. Ill. July 23, 2021) .......... 9

*VirtnetX, Inc. v. Cisco Sys.*,
767 F.3d 1308 (Fed. Cir. 2014) .......... 16, 17, 18

*Wendler & Ezra, P.C. v. American Intern. Group, Inc.*,
521 F.3d 790 (2008) .......... 12

## INTRODUCTION

Plaintiff Kenall Manufacturing Company proposes expert testimony from three individuals: a market expert, Brian Golden, a technical expert, Frank Reid, and a damages expert, Melissa Bennis. Their reports and deposition testimony, however, make clear that their opinions are inconsistent with the law and unreliable such that they would only confuse or mislead the trier of fact. Consequently, this Court should exercise its gatekeeping role and strike the opinions of these experts pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

*First*, Reid's opinions should be excluded in their entirety because he is presented to opine on the absence of acceptable non-infringing substitutes. However, Reid completely ignores the fundamental requirement of this *Panduit* factor – that the alternatives be *non-infringing*. Reid does not review the patents-in-suit; indeed, he is not even aware of their contents. An expert who is unaware of the patents can certainly not opine to a jury as to which products may or may not be non-infringing alternatives. Therefore, Reid lacks the qualifications and basis for the opinion contained in his report.

*Second*, Golden's opinions on the market and the demand for the patented product should be excluded in their entirety. Golden admits that he did not review the specification or claims of the patents-in-suit, nor does he understand what the invention of the patents-in-suit may be. His opinion is fundamentally and fatally flawed because he cannot opine on what is patented.

*Third*, Bennis' opinions are likewise flawed. Bennis' calculation of lost profits depends upon both Golden's unreliable definition of the lighting market and Reid's unreliable opinion that there are no acceptable non-infringing substitutes. To the extent the Court excludes Golden and Reid's opinions on these topics, it should exclude Bennis' opinions as well. Bennis' opinions also fails to consider key facts and should be excluded for the independent reason that she does not perform the analyses

needed to develop her damages calculations. Bennis' opinion is without any sound economic foundation and furthermore does not rely on a market study.

These expert opinions are without foundation and should not be put to a jury.

## BACKGROUND

This case arises from a dispute over a Settlement and License Agreement ("2007 Agreement") which was entered into to resolve a 2007 patent infringement litigation. The patents-in-suit, in the 2007 litigation and in this case, are related to "modular lighting system[s]." Dkt. 1 at ¶21. They "relate to lighting fixtures which provide versatility and adaptability in lighting systems, allowing users to configure lighting systems according to their needs. This may be accomplished by using a joiner band (or bridge) or other geometric connectors to connect two or more single lighting fixtures together to create a continuous unit." Ex. A, Bennis Report at 9.

In the 2007 litigation, Plaintiff accused two of Cooper's architectural vandal resistant linear fluorescent light fixtures of infringement: Fail-Safe Harmony Vandal Resistant Linear ("HVL") Single ("Subject Single Products") and Continuous ("Subject Continuous Products"). Subject Continuous Products are combined in a continuous formation with the use of "connector bands"—an interim joiner component that connects two units. Subject Single Products are stand-alone, sealed products incapable of using connector bands that nonetheless share the same aesthetic profile as the Subject Continuous Products.

The 2007 litigation was resolved when the parties entered into the 2007 Agreement wherein Plaintiff licensed Cooper for the Subject Continuous Products. Plaintiff also offered Cooper a flat rate royalty on the Subject Single Products. But because Subject Single Products were not modular, did not use joiner bands, and were standalone fixtures, Cooper opted instead to redesign them by a date certain.

Plaintiff now alleges that Cooper breached the 2007 Agreement. Plaintiff also alleges patent infringement based on Cooper's sales of the Subject Single Products after the redesign date. Importantly, Subject Continuous Products are licensed and are NOT part of Plaintiff's patent infringement claim.

In order to prove its damages for both its breach of contract (Count I) and patent infringement (Count II) claims, Plaintiff presents three experts. These experts are devoted to the sole issue of damages stemming from Plaintiff's two claims: All three address issues related to patent damages, while only one opines on contract damages.

*Frank Reid Report*

Frank Reid is presented as a technical expert to opine on the "advantages of Kenall's Millenium Stretch modular linear lighting fixtures and on the matter of what would or would not be considered an acceptable substitute." Ex. B, Reid Report at ¶1. His opinions are based on his "personal knowledge concerning the lighting fixture products of the parties to this litigation, including Kenall's Millenium Stretch linear lighting fixtures and Cooper's Fail-Safe HVL linear lighting fixtures." *Id.* at ¶9. Reid also reviewed one concept drawing of the redesigned Cooper Fail-Safe HVL product. *Id.* Reid did not review the patents-in-suit. *See id.* Reid defines the Millenium Stretch product as "architectural linear lighting fixtures for high abuse and rough service environments." *Id.* at ¶10. He further defines these fixtures as being modular and having "module end structures that provide versatility to meet a wide range of architectural demands while still meeting requirements of high abuse and rough service applications. Also, the module end structures provide for easy fixture accessibility and ease of maintenance." *Id.* at ¶12. Reid opines further, without distinguishing between the Subject Continuous Products and the non-modular Subject Single Products, that the Subject Continuous Products and Subject Single Products "have been regarded and described in the market as 'equal' to Millenium Stretch fixtures" (*id.* at ¶23) and that as a specifier, on a project bid he only

listed Millenium Stretch products with the Subject Continuous Products and Subject Single Products and that he was "unable to list another acceptable substitute." *Id.* at ¶24. Based on a concept drawing, Reid opined on the redesigned HVL and determined that it "cannot be described as an equal to the Millenium Stretch fixtures." *Id.* at ¶29. Reid went on to conclude his report with a statement that he is "unaware of any vandal resistant architectural linear lighting fixtures which would be acceptable substitutes unless they also have the above-described module end structures" of Millenium Stretch. *Id.* at ¶30.

*Brian Golden Report*

Brian Golden is presented as an expert in the lighting market. He opines on "certain dynamics, processes, entities, roles and definitions in the lighting market." Ex. C, Golden Report at ¶3. Golden opines that the products at issue in this litigation are in the specific field of "architectural linear vandal resistant lighting" and that "relatively few companies have provided architectural linear vandal resistant lighting fixtures." *Id.* at ¶19.

*Melissa Bennis Report*

Melissa Bennis is presented as a damages expert. She calculates patent damages as "a combination of lost profits and reasonable royalties" because "'but for' Cooper's sales of Subject Single Products, Plaintiff would have made additional sales" of Millenium Stretch products and "Kenall would further be entitled to a reasonable royalty on the remainder of Cooper's sales of the infringing Subject Single Products that are not subject to damages in the form of lost profits." Ex. A, Bennis Report at 21. To prove that lost profits should be awarded, Bennis relies on the *Panduit* factors. *Id.* at 34. For the first *Panduit* factor, demand of the patented product, Bennis relies on the testimony of Golden. For the second *Panduit* factor, absence of acceptable non-infringing substitutes, she relies on the testimony of Reid. To arrive at the reasonable royalty rate she applied to the residual Subject Single Product sales, Bennis considers the *Georgia-Pacific* factors and opines that the rate should be

15%. *Id.* at 79. She applies this measure to the sales of Subject Single Products from 2011-2016, as limited by 35 U.S.C. §286. As to the breach of contract damages, Bennis focuses on Cooper's "not making royalty payments, failing to redesign [Subject Single Products], and failing to mark its [licensed] products." *Id.* at 24. For Cooper's unpaid royalties on Subject Continuous Products, Bennis calculates underpayment, interest, and unpaid royalties on connector bands. *Id.* at 26. For failing to redesign Subject Single Products, Bennis relies on the lost profits and reasonable royalty calculation she reaches for the patent infringement count but expands the calculation to 2008. For failing to mark, Bennis does not calculate any damages. *Id.* at 89-90.

## APPLICABLE LEGAL STANDARDS

*The Court's Gatekeeping Function Under Daubert*

Expert testimony presents the threshold question of whether a witness is "qualified as an expert by knowledge, skill, experience, training, or education" to offer an opinion. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (quoting Fed. R. Evid. 702). Courts consider not just "whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal citations omitted). Courts must then "compar[e] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony" to ensure that the expert testifies within his or her area of expertise. *Id.* at 616 (internal citations omitted).

Even if an expert is qualified to opine on a particular topic, it is the district court's duty to ensure that unreliable or unhelpful expert testimony does not reach the jury. *See Daubert*, 509 U.S. at 597. The purpose of the *Daubert* inquiry is to "vet the proposed testimony under Rule 702's requirements that it be 'based on sufficient facts or data,' use 'reliable principles and methods,' and 'reliably appl[y] the principles and methods to the facts of the case.'" *Martin v. F.E. Moran, Inc.*, 2017 WL 1105388, at *1 (N.D. Ill. Mar. 24, 2017) quoting *Lapsey v. Xtek, Inc.*, 689 F.3d 802, 804

(7th Cir. 2012). The Court should "scrutinize the proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* (internal citations omitted). Both scientific and nonscientific expert testimony is subject to the *Daubert* framework. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999).

Expert testimony should not be presented to the jury unless the proponent of that testimony demonstrates by a preponderance of the evidence that the proposed testimony is (1) based on sufficient facts and data, (2) the product of reliable principles and methods, and (3) based on a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-93.

*Reasonable Royalty For Patent Infringement*

The Patent Act at 35 U.S.C. § 284 provides that "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." The reasonable royalty is calculated by applying the "*Georgia-Pacific* factors" established in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) and as accepted by the Federal Circuit. *See e.g.*, *Minks v. Polaris Indus. Inc.*, 546 F.3d 1364 (Fed. Cir. 2008). There are fifteen factors commonly affiliated with this analysis, including, for example: (Factor 1) the royalties received by the patentee for the licensing of the patent-in-suit; (Factor 2) the rates paid by the licensee for the use of other patents comparable to the patent-in-suit, (Factor 6) the effect of selling the patented specialty in promoting sales of other products of the licensee; (Factor 9) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results; (Factor 10) the extent to which the infringer has made use of the invention; and (Factor 15) the amount that a licensor (such as the patentee) and a licensee (such as the infringer)

would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement. *Georgia-Pacific Corp.,* 318 F. Supp. at 1120.

*Lost Profits For Patent Infringement*

A patentee may alternatively receive damages in the form of lost profits. To recover lost profits damages for patent infringement, the patentee "must show that it would have received the additional profits 'but for' the infringement. The patent owner bears the burden to present evidence sufficient to show a reasonable probability that it would have made the asserted profits absent infringement." *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995).

Whether a patentee is entitled to recover lost profits is determined by the "*Panduit* factors" established in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978) and as accepted by the Federal Circuit. *See e.g., Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017). The *Panduit* factors are: (1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and, (4) the amount of profit the patentee would have made. *Panduit Corp.,* 575 F.2d at 1156. The inability to establish even one of these requirements is fatal to a lost profits analysis. *See e.g., Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1165 (Fed. Cir. 1991) ("Accordingly, a patentee is not entitled to lost profits if the patentee fails to establish any of the [*Panduit*] requirements."). Importantly, lost profits are not a mechanism to disgorge or punish an alleged infringer. *Pall Corp. v. Micron Separations, Inc*., 66 F.3d 1211, 1223 (Fed. Cir. 1995) ("[T]he purpose of compensatory damages is not to punish the infringer, but to make the patentee whole.") Rather, they are based on the profits the patentee establishes it would have made but-for the infringement. *King Instruments Corp.,* 65 F.3d at 952.

## ARGUMENT

### I. PLAINTIFF'S TECHNICAL EXPERT, FRANK REID, DID NOT EVALUATE THE SCOPE OF THE PATENTS-IN-SUIT AND THUS CANNOT OPINE ON THE POSSIBILITY OF ALTERNATIVES TO THE CLAIMED INVENTION, HENCE HIS TESTIMONY SHOULD BE EXCLUDED.

Plaintiff proffers Reid as a technical expert ostensibly to offer testimony regarding the benefits and features of the patents-in-suit and the alleged lack of non-infringing acceptable alternatives. Specifically, his opinion relates at least to *Panduit* Factor 2 and *Georgia-Pacific* Factors 9 and 10.[1] But Reid failed to review or analyze the patents-in-suit and did not consider any other competitive products; he simply relied on his belief that there are no other products in the field. His opinion therefore is unreliable and unhelpful.

Reid was retained "as a technical expert…to render opinions related to advantages of Kenall's Millenium Stretch modular linear lighting fixtures and on the matter of what would or would not be considered an acceptable substitute." Ex. B, Reid Report, ¶1. Reid opines that the "Millenium Stretch fixtures are popular" (*id.* at ¶11) because "they are modular and offered by Kenall as individual, continuous-row and other geometric installations." *Id.* at ¶12. Reid opines that the particular features of the Millenium Stretch fixtures drive customer demand. Reid then opines on Cooper's old design HVL fixtures, both single and continuous, as an "equal" to Millenium Stretch (*id.* at ¶23) and Cooper's redesign HVL as not an equal because it does not have the same "unique end structures" (*id.* at ¶29) to provide for "the advantage of adaptability to different configuration choices." *Id.* at ¶28. Reid ultimately concludes that he is "unaware of any vandal resistant architectural linear lighting fixtures which would be acceptable substitutes." *Id.* at ¶30. But none of these opinions are scientifically or technically reliable or appropriate.

[1] *Panduit* Factor 2 is the absence of acceptable non-infringing substitutes. *Panduit Corp.,* 575 F.2d at 1156. *Georgia-Pacific* Factors 9 and 10 are respectively, the utility and advantages of the patent over old modes or devices, and the nature of the patented invention. *Georgia-Pacific Corp.*, 318 F. Supp. 1116 at 1120.

It is axiomatic that to determine whether something is or is not a non-infringing alternative, one must understand the scope of the patents. *See Martin v. Barber*, 755 F.2d 1564, 1567 (Fed. Cir. 1985) ("[Infringement] is determined by comparing the accused device with the claims in suit."). Yet Reid concedes that he lacked this fundamental knowledge in formulating his opinions:

> "Q. Mr. Reid, in preparation for your report, did you review the patents-in-suit? A. No." (Ex. D, 5/31/22 Reid Dep. Tr. at 126:15-17). "Q. Do you have a general understanding of what the patents cover in this litigation? [] A. Well, no, I don't know all the details. No, I do not." (*Id.* 127:13-19).

As such, he cannot aid the jury in determining whether there existed non-infringing alternatives, including Cooper's 2016 redesign of the single HVL. *See Mentor Graphics Corp. v. EVE-USA, Inc*., 851 F.3d 1275, 1285 (Fed. Cir. 2017) (the second *Panduit* factor "considers demand for particular limitations or features of the claimed invention"). Put simply, without even a baseline understanding of the patents-in-suit, Reid cannot opine on products that may or may not *infringe* those patents. He fails to provide any "specialized knowledge" that would "assist the trier in fact in understanding the evidence or determining a fact in issue." *Daubert*, 509 U.S. at 592.

Worse yet, Reid attempts to opine as to alternatives, or the lack thereof, without undertaking even a cursory review of other potential non-infringing alternatives on the market. Reid had the opportunity to look into such acceptable alternatives, but he admittedly chose not to. Ex. D, 5/31/22 Reid Dep. Tr., at 94:12-16. Specifically, despite having reviewed Cooper's technical expert report eight weeks before his deposition, Reid still did not analyze any of the many alternatives listed therein. *Id.* at 241:20-25.

Even as to his analysis on whether any alternative could be acceptable to a consumer, Reid's analysis was untethered to Cooper's 2016 redesign of the single HVL products. *See e.g., Trading Techs. Int'l, Inc. v. IBG LLC*, No. 10 C 715, 2021 WL 5038755, at *2 (N.D. Ill. July 23, 2021) ("The acceptability analysis must compare the advantages of the patented item to the features and functionality of the proposed alternative"). Reid's analysis wrongly focuses on features related to the

continuous features of the 2016 redesign. He focuses on the bolting of the ends of the adjoining units "in order to form a row of HVL units" (*id.* at ¶26) and that such "bolt holes and wire holes" are disadvantageous because they allow for "ingress of moisture and other tiny debris." *Id.* at ¶27. Reid also testified that he determined the *concept* of the redesign, and not the actual redesign of the single HVL, is not an acceptable non-infringing substitute because of features of the continuous HVL products. Ex. D, 5/31/22 Reid Dep. Tr., at 94:18-24. This is significant because the 2016 redesigned single HVL is not modular nor used in continuous configurations. Reid's analysis is thus completely unreliable and his opinions should not be presented to the jury.

## II. PLAINTIFF'S MARKET EXPERT, BRIAN GOLDEN, DID NOT EVALUATE THE SCOPE OF THE PATENTS-IN-SUIT AND THEREBY DID NOT ASSESS THE RELEVANT MARKET DEMAND, HENCE HIS TESTIMONY SHOULD BE EXCLUDED.

Golden is presented as a market expert relating to the demand for the patented product under the *Panduit* factors and as to *Georgia-Pacific* Factors 6, 9, and 10.[2] But Golden admits that he did not review the specification or claims of the patents-in-suit, nor does he understand what the invention of the patents-in-suit may be. Yet despite having done no assessment of the scope of the patents-in-suit, he purports to opine on the market demand for the ***PATENTED*** product. He further does not limit or tie his opinion to demand for the allegedly patented single fixtures - Cooper's Subject Single Products and Kenall's standalone Millenium Stretch. His opinion is fundamentally and fatally flawed such that he simply should not and cannot be presented to the jury as an expert on the benefits of the patents-in-suit or their impact on the market. *Teradata Corp. v. SAP SE*, 570 F. Supp. 3d 810, 841 (N.D. Cal. 2021) ("Because his methodology for defining the relevant tying market is unreliable, his conclusions that SAP has market power in his proposed market should also be excluded.")

---

[2] Respectively, the effect of selling the patented specialty in promoting sales of other products, the utility and advantages of the patent over old modes or devices, and the nature of the patented invention. *Georgia-Pacific Corp.*, 318 F. Supp. 1116 at 1120.

Golden was "retained as a lighting-market expert" (Ex. C, Golden Report at ¶1) to opine on "certain dynamics, processes, entities, roles and definitions in the lighting market." *Id.* at ¶3. But Golden admitted that he was not a product expert, nor did he consider the accused products or their features when arriving at his opinions. Ex. E, Golden Dep Tr., at 80:20-24, 83:19-24. Golden has not undertaken the proper analysis to offer an opinion on the relevant market related to the patents-in-suit as he does not know what is claimed therein. Golden, just like Reid, concedes that he did not have this fundamental knowledge in arriving at his opinions:

"Q. What is your understanding of the alleged invention of the patents-in-suit? [Objection] A. Yes, I would say that I'm not an engineer and I did not review the patents to that level of detail." (Ex. E, 5/10/22 Golden Dep. Tr., at 97:19-98:1)

"Q. Did you review the claims? A. The claims of the case? Q. The claims of the patents. A I don't recall. Q. Did you review the specification of the patents? A. I don't recall." (*Id.* at 98:13-18)

Without a basic understanding of the patents-in-suit, Golden cannot provide the jury with a reliable analysis of the demand in the market related to the patented product. When confronted with how he evaluated market demand, Golden was able to provide only the generic response of "certain dynamics, processes, entities, roles, and definitions in the lighting market." Ex. E, 5/10/22 Golden Dep. Tr., at 96:7-11. He did not look at the market as it relates to single vandal-resistant fixtures relevant to the alleged patent infringement or consider the impact of the patented invention on the relevant marketplace. In fact, Golden readily admitted that "I've never claimed to have expertise in vandal resistant products." Ex. E, 5/10/22 Golden Dep. Tr., at 129:23-24. Golden also conceded that "I did not see myself as a product expert for the purpose of this deposition when I did my report." *Id.* at 80:22-24. When asked if he considered any products for his report, Golden responded that he was only looking at the "lighting market, how – the role of lighting agents, how products are specified, the difference between lighting products and spec products." *Id.* at 81:1-7. Golden's opinion is so broad that he was forced to admit that someone in Plaintiff's employ would be better suited to talk about the market for Kenall's Millenium Stretch when his expertise is limited to the "general market

and how projects come together and how the nuances of how agents use spec-locking products to pull through other projects on job." *Id.* at 94:13-24. As such, his opinion is wholly speculative and unhelpful. *Wendler & Ezra, P.C. v. American Intern. Group, Inc.,* 521 F.3d 790 at 791 (2008) (it is axiomatic that an "expert's *ipse dixit* is inadmissible," as "'[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process'.").

Simply put, Golden is not qualified to be an expert on the market demand of products practicing the patented invention because he (a) admits he has no idea what the patents-in-suit cover, and (b) admits he is not an expert in the relevant market and should be precluded on these bases alone. *See* Fed. R. Evid. 702(a) (an expert must "help the trier of fact to understand the evidence or to determine a fact in issue."); *Daubert*, 509 U.S. at 593; *see Good Tech. Corp. v. Mobileiron, Inc.*, 2015 WL 4090431 at *8 (N.D. Cal. July 5, 2015) (excluding opinions of an expert who was "more than qualified technically" but lacked "experience in consumer demand related to [the] non-infringing alternatives"); *see also Brandeis Univ. v. Keebler Co.*, 2013 WL 5911233 at *7 (N.D. Ill. Jan. 18, 2013) (excluding damages expert testimony when expert had no expertise in consumer demand of product at issue).

## III. PLAINTIFF'S DAMAGES EXPERT, MELISSA BENNIS', TESTIMONY SHOULD BE EXCLUDED.

Bennis is an economist submitted to opine on the amount of damages under three models: lost profits (for both patent and breach of contract counts), reasonable royalty (for both patent and breach of contract counts), and restitution (for breach of contract count). Bennis' lost profits analysis is the culmination of the hollow opinions proffered by Golden and Reid such that should the Court agree that either or both should be barred under *Daubert*, Bennis' corresponding lost profits analysis fails at its foundation. As to reasonable royalty, Bennis inexplicably failed to consider key facts in her analysis, rendering it objectively unreliable. And Bennis herself offers no opinion on the basis for

restitution. Bennis' unsupported positions discredit her. Each of these opinions, individually and as a whole, violates *Daubert.* Cooper addresses each in turn below.

### A. BENNIS' RELIANCE ON GOLDEN AND REID DOOMS HER LOST PROFITS ANALYSIS.

There is no dispute that Bennis is an economist with no connection to the lighting industry or technical knowledge of the patents-in-suit or corresponding market. As is typical with economic experts, she relies on Golden and Reid for these topics. But as set forth above, neither Golden nor Reid presents opinions that pass muster under Federal Rule of Evidence 702. Because Bennis' lost profits analysis builds on Golden and Reid, her lost profits analysis also should be precluded as a matter of law. *See Guardant Health, Inc. v. Found. Med., Inc.*, 2020 WL 2461551 at *19 (D. Del. May 7, 2020) (precluding damages expert from testifying on subjects where the underlying technical experts were found to be unreliable).

She expressly relies on Golden regarding the market and how products are sold on the market for demand of the patented product (*Panduit* Factor 1) and the testimony of Reid purporting to conclude that Cooper's redesigned single product is not an acceptable non-infringing substitute (*Panduit* Factor 2). Ex. F, 6/8/22 Bennis Dep. Tr., at 40:6-18; 41:23-10; 136:3-9; 143:21-144:13; 153:13-156-16; 158:1-21; 195:4-196:3; 198:4-199:10. But as explained above, neither Golden nor Reid reviewed or considered the patents as part of their analysis. As such, they cannot opine on the relative market demand for the patented product or acceptable non-infringing alternatives. As a result, Bennis' lost profits analysis is fruit of the poisonous tree that too fails under *Daubert*.

### B. BENNIS' ROYALTY RATE CANNOT STAND AS IT IS WHOLLY UNSUPPORTED AND THREE TIMES GREATER THAN THE CURRENT ROYALTY ENJOYED BY COOPER FOR ACCESS TO THE VERY SAME PATENTS-IN-SUIT.

Bennis also opines on the proper reasonable royalty purportedly under the *Georgia-Pacific* factors. She opines that the rate applicable in this case is 15%. But her opinion on this score is

unreliable and untethered from undisputed facts. She was also unaware of key facts rendering her opinion further suspect.

The *Georgia-Pacific* factors provide the legally required framework for assessing a reasonable royalty. Those factors are to be considered in the context of a willing licensor and licensee at the time of alleged infringement. Here, there was a real-life negotiation between the parties, on the exact same patents and same products. [redacted] Ex. G, 2007 Agreement at Ex. 3, p. 3.

Nevertheless, Bennis opines that a reasonably royalty in this case [redacted]

[redacted]

Even though she had a chance to review this information after receiving Cooper's damages expert report, which mentions and cites to such correspondence, or after reviewing his deposition transcript, Bennis continues to ignore the information.

Bennis' royalty analysis is further flawed as she fails to properly apply the *Georgia-Pacific* factors. "When performing a *Georgia-Pacific* analysis, damages experts must not only analyze the applicable factors, but also carefully tie those factors to the proposed royalty rate." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC,* 879 F.3d 1332, 1349 (Fed. Cir. 2018). Bennis identifies a series of purportedly comparable licenses in her report. However, those licenses range [redacted].[3] Ex. A, Bennis Report at 61-63; 76. Yet, she inexplicably opines that the rate here should be 15%.[4] And, she does so despite the most comparable license, for single, standalone products, [redacted] This is precisely the type of misleading opinion *Daubert* is meant to prevent. 509 U.S. at 595; *see also Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002) (discussing misleading opinions *Daubert* is meant to preclude).

The Federal Circuit has previously found a Bennis royalty rate opinion to be "inadmissible as it failed to adequately tie [her] proposed reasonable royalty rate to the facts of [the] case." *Exmark Mfg. Co. Inc.*, 879 F.3d at 1349. In that case, Bennis was asked to opine on behalf of patentee on what a reasonable royalty rate would have been for a patent "directed to a lawn mower having improved flow control baffles." *Id.* at 1338. In her analysis of the *Georgia-Pacific* factors, the court opined that she discussed each factor but then "concluded with little explanation that [the parties] would have agreed to a 5% reasonable royalty rate on the sales of the accused lawn mowers as the value for the

---

3 [redacted]

4 [redacted]

5 [redacted]

improved baffle." *Id.* at 1349. But the court found that "[n]owhere in her report, however, did she tie the relevant *Georgia–Pacific* factors to the 5% royalty rate or explain how she calculated a 5% royalty rate using these factors." *Id.* Just as Bennis did here, the court found that she explained the benefits of the patented products based on "testimony of experts and fact witnesses" and "identified a number of advantages arising from the use" of the patented product, "but she did not explain how these advantages, or her analysis of the *Georgia–Pacific* factors, led to her proposed 5% royalty rate." *Id.* at 1349-50. Here to, Bennis has failed to tie her 15% royalty rate – [redacted] - to the facts of this case and this Court should exclude her testimony.

### C. BENNIS' ROYALTY BASE ALSO IS IMPROPERLY INFLATED BECAUSE SHE FAILED TO APPORTION.

Bennis' application of this 15% royalty is also grossly inflated because she did not even attempt to perform an apportionment analysis on the underlying base used for her damages assessment. *See CSIRO v. Cisco Sys*., 809 F.3d 1295, 1301 (Fed. Cir. 2015) ("This principle–apportionment–is the governing rule where multi-component products are involved").

As courts have explained, a patentee must separate the value of the allegedly infringing features from the value of other features or prove that other features do not cause consumers to purchase the product. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc*., 904 F.3d 965, 979 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1265 (2019) ("But when the product contains multiple valuable features, it is not enough to merely show that the patented feature is viewed as essential, that a product would not be commercially viable without the patented feature, or that customers would not purchase the product without the patented feature. When the product contains other valuable features, the patentee must prove that those other features do not cause consumers to purchase the product.") (emphasis added); see *CSIRO, 809 F.3d at 1301* ("to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features"). In *VirtnetX*, the Federal Circuit excluded an expert's damages testimony exactly

because of this failure: "In calculating the royalty base, [the expert] did not even try to link demand for the accused device to the patented feature and failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products. Because [the expert] did not 'carefully tie proof of damages to the claimed invention's footprint in the marketplace,' *Uniloc*, 632 F.3d at 1317 (quoting *ResQnet*, 594 F.3d at 869), his testimony on the royalty base under this approach was inadmissible and should have been excluded." *VirtnetX, Inc. v. Cisco Sys*., 767 F.3d 1308, 1329 (Fed. Cir. 2014).

At issue here are lighting fixtures with numerous components detached from the patent claims including but not limited to, protective and decorative glass, underlying electronic circuitry, an electronic ballast, light bulbs and more.[6] Moreover, Plaintiff has repeatedly characterized the crucial feature of the patents as the endcaps with "the full benefit of the modularity of the lighting system," a feature fully lacking in the Subject Single Products, as such products are sealed standalone fixtures and not modular. But there is no dispute that, for example, a light source (i.e., lamp or bulb) is an essential part of the product and that the light source is not covered by the patents-in-suit. Yet, Plaintiff has no technical expert that has identified the contribution of the patents-in-suit to the products (indeed, Plaintiff's purported technical expert admitted to not even having read the patents-in-suit), let alone apportion the patents' contribution to the overall product. Bennis even states that she has been "advised that it is appropriate to use the entire market value of the product because the patented feature accounts for almost all of the value of the product as a whole." Ex. A, Bennis Report at p. 59. Bennis has no understanding herself of the patented features, neither do the other two experts, thus Bennis' advisement comes directly from Plaintiff's counsel. This is improper. Bennis' failure to apportion renders her royalty base inherently unreliable.

---

[6] Of course, this analysis could not be done when the experts were without technical understanding of the patents-in-suit.

As such, Bennis' opinion is an improper damages assessment, with wholly absent analyses that are required to render a reliable and accurate valuation of damages. *See, e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012) ("Whether called 'product value apportionment' or anything else, the fact remains that the royalty was expressly calculated as a percentage of the entire market value of a [multi-component product] rather than a patent-practicing [component] alone. This, by definition, is an application of the entire market value rule"); *see also VirtnetX*, 767 F.3d at 1329 ("'Whether viewed as valuable, important, or even essential,' the patented feature must be separated").

Therefore, the Court should exclude Bennis' analysis as to the royalty base as it does not fit the facts of the case and will not be helpful to assist the trier of fact. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (neither "*Daubert* [n]or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipsi dixit* of the expert" because "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

### D. BENNIS' BREACH OF CONTRACT DAMAGES CALCULATION IS IMPROPER.

Bennis also attempts to make a damages calculation for Cooper's alleged breach of contract for failure to redesign. Her calculation for this alleged breach though *is* her calculation for patent damages for the sale of Subject Single Products. Bennis asserts that the 2007 Agreement "called for Cooper to redesign the Single Subject Products by April 1, 2008." (Ex. A, Bennis Report at 27). Even though nowhere does the contract require that Cooper *sell* the redesigned product, she then opines "[g]iven Cooper's conceded failure to do so and therefore breach of [the 2007 Agreement] between the parties, I have calculated the amounts lost to Kenall as a result of Cooper selling infringing products." (*Id.*) Bennis admits that she is pursuing breach damages based on patent infringement (Cooper selling infringing products). Indeed, she explicitly states she calculated Plaintiff's breach of

contract losses "by virtue of the amount that it would have been due under its claim for patent damages." (*Id.*) Bennis's damages calculation is thus flawed.

Breach of contract damages is not the same calculation as patent damages. For breach of contract, the measure of damages "is the amount that will compensate the aggrieved party for the loss which either fulfillment of the contract would have prevented or which the breach of it has entailed." *Santorini Cab Corp. v. Banco Popular N. Am.*, 999 N.E.2d 46, 52 (IL App (1st) 2013). While both offenses can be corrected by a payment of lost profits, the lost profits for a breach of contract are determined by *actual lost sales* of the Plaintiff, not the *Panduit* Factors. Plaintiff must prove lost profits "with reasonable certainty," and it is not available "where proof of the claimed profits is remote or speculative." *Id.* at 51. Plaintiff "bears the burden of presenting competent proof of lost profits from which a reasonable basis of computation may be derived." *Id.* Bennis does not opine on Plaintiff's profits or losses, nor does Plaintiff present such evidence. Without having looked at this evidence, Bennis cannot assume that Plaintiff has in fact lost sales. Furthermore, Bennis does not even discount the percentage of her patent damages analysis that includes reasonable royalty. Of course, in a contract damages lost profits analysis, reasonable royalty is not a valid damages calculation – it must be Plaintiff's *actual* loss.

Bennis' opinion on breach of contract for failure to redesign is unhelpful and misleading to a jury. She simply did not undertake the necessary damages calculation. Providing her damages calculation to the jury would be misleading, unhelpful, and prejudicial.

### E. RESTITUTION IS, BY BENNIS' OWN ADMISSION, AND UNDER THE LAW, AN IMPROPER DAMAGES CALCULATION AND SHOULD BE STRICKEN.

Bennis also attempts to make a restitution calculation for breach of contract damages. Bennis' entire explanation of this theory rests in less than one-half page, where she simply states, "if the Court provides an award for restitution for Cooper's breaches," the amount should be $4,890,021. Ex. A,

Bennis Report at 88. She appears to suggest that this is based on "relinquishment of the benefit obtained through Cooper's improper actions." *Id.* There is no basis for such a claim nor has Plaintiff properly pled equitable relief, including restitution, in this case.

Bennis cannot make this damages analysis because Plaintiff's Complaint has no mention of restitution. Bennis' calculation for restitution in the form of "relinquishment of the benefit obtained through Cooper's improper actions" is thus improper. *Apple v. Inc v. Samsung Electronics Co., Ltd*. 2012 WL 3155574 at *5 (N.D. Cal. Aug. 2, 2012); *NeuroGrafix v. Brainlab, Inc.*, No. 12 C 6075, 2021 WL 1057312, at *5 (N.D. Ill. Mar. 18, 2021).

Plaintiff is not entitled to make a restitution claim because restitution damages are legally impermissible under breach of contract. Restitution is an equitable remedy that is not available when "there is a contract between the parties on the subject in dispute." *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533 (7th Cir. 2008); *see also Tillman v. U.S. Energy Sav. Corp*., No. 08 C 1641, 2008 WL 2754813, at *1 (N.D. Ill. July 14, 2008) (stating that when an express contract exists, recovery cannot be based on an equitable remedy). Bennis admittedly rests her restitution analysis entirely on Cooper's alleged breach of ***contract***, thereby precluding that very remedy. *Plestsov v. GTS Transportation Corp*., No. 20 CV 1847, 2021 WL 534666, at *3 (N.D. Ill. Feb. 12, 2021) (holding that restitution, a form of unjust enrichment, only applies when there is no "actual agreement between the parties."). Therefore, Bennis' opinion on restitution provides no help to a jury that is not allowed to provide such relief.

## CONCLUSION

Because none of Plaintiff's three experts provide opinions that are helpful to the trier of facts, this Court should exercise its gatekeeping function and exclude the opinions of Reid, Golden, and Bennis.

Dated: July 15, 2022

Respectfully Submitted,

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP

*/s/ Zaiba Baig*
Kal K. Shah
Zaiba Baig
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
Telephone: 312.212.4949
Facsimile: 312.757.9192
Email: kshah@beneschlaw.com
Email: zbaig@beneschlaw.com

*Attorneys for Defendants Cooper Lighting, LLC and Eaton Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants and served via email upon counsel of record the unredacted documents.

*/s/ Zaiba Baig*

*One of the Attorneys for Defendants*
*Cooper Lighting, LLC and*
*Eaton Corporation*