UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KENALL MANUFACTURING COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 4575 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| COOPER LIGHTING, LLC, and EATON | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Kenall Manufacturing Company brought this suit against Cooper Lighting, LLC and

Eaton Corporation (together, "Cooper"), alleging patent infringement and breach of contract.

Doc. 1. With discovery completed, the parties move to bar the testimony of certain experts and

for partial summary judgment on several issues. Docs. 474, 479, 484, 490, 496, 504, 508. At the

parties' and the Magistrate Judge's request, the court focuses on certain motions pertinent to

patent infringement damages—Cooper's motion to bar Kenall's experts, Doc. 504; the parties'

cross-motions for summary judgment regarding lost profits, Docs. 496, 508; and Cooper's

motion for summary judgment limiting a reasonable royalty to five percent, Doc. 508. The

summary judgment motions are denied, and Cooper's motion to bar is granted in part and denied

in part.

**Background**

Because the parties cross-move for summary judgment, the court will view the disputed

facts in the light most favorable to Kenall when considering Cooper's motions and in the light

most favorable to Cooper when considering Kenall's motion. *See First State Bank of Monticello*

*v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had

cross-motions for summary judgment before it, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted).  At this juncture, the court must assume the truth of those facts, but does not vouch for them.  *See Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

Kenall and Cooper are competing commercial lighting manufacturers.  Doc. 510 at ¶¶ 1, 3; Doc. 549 at ¶ 40.  In 2012, Eaton acquired Cooper, which operates as "Eaton's Lighting Division."  Doc. 500-1 at ¶ 4.  For ease of reference, and because Eaton may be ignored for present purposes, Eaton and Cooper are referred to together as "Cooper."

Kenall holds several patents on technology practiced in its Millenium Stretch lighting products.  Doc. 510 at ¶¶ 4, 8.  The first, U.S. Patent No. 6,984,055 ("the '055 patent"), issued on January 10, 2006, covers a "modular lighting fixture adaptable for being implemented in various shapes and configurations."  Doc. 500-1 at ¶ 8; Doc. 1-2 at 11.  In 2007, Kenall sued Cooper, alleging that Cooper's Fail-Safe Harmony VR Linear Series ("HVL") lighting fixtures infringed the '055 patent.  Doc. 500-1 at ¶ 1; Doc. 510 at ¶¶ 10, 13; *see Kenall Mfg. Co. v. Cooper Lighting, Inc.*, No. 07 C 603 (N.D. Ill. filed Jan. 31, 2007).  The parties resolved that suit pursuant to a Settlement Agreement and a Confidential License Agreement.  Doc. 510 at ¶ 14; Doc. 500-1 at ¶ 1.  The Settlement Agreement provided that, "[s]ubject to full compliance by Cooper with this Agreement and with the terms of the Confidential License Agreement, Kenall waives … its claims against Cooper for patent infringement damages with respect to manufacture and sale occurring before the date of this Agreement."  Doc. 1-1 at p. 3, ¶ 3.

The License Agreement granted Cooper "a worldwide, nonexclusive license" under the '055 patent and any patents stemming therefrom (collectively, the "Subject Patents") and, "[s]ubject to the terms, conditions and limitations in th[e] Agreement," to manufacture and sell

Cooper's "Linear Continuous" and "Linear Single" products, which the Agreement refers to as the "Subject Continuous Products" and "Subject Single Products," respectively, and collectively as the "Subject Products." *Id*. at pp. 35-36, § 1. In return, Cooper agreed to place a patent notice on every licensed product starting no later than December 31, 2007; to make a one-time payment of $30,000 within seven days of executing the Agreement; and to make quarterly royalty payments of five percent of net sales of the Subject Continuous Products starting on January 1, 2008 and continuing through the expiration of the last Subject Patent. *Id*. at pp. 37-39, §§ 5.A, 5.B, 9. Cooper also agreed to redesign its Subject Single Products "to have a one-piece end unit instead of the current two-piece end unit, such redesigned product being referred to … as the 'Re-Designed Single Product,'" by January 1, 2008. *Id*. at p. 36, § 2. If Cooper needed additional time for the redesign, it could continue to sell the Subject Single Products until April 1, 2008, subject to a five percent royalty. *Id*. at pp. 36-37, §§ 2, 5.C.

The License Agreement included a "No Challenge Clause," which provided that, although "Cooper does not admit infringement, validity or enforceability of the Subject Patents, and reserves all defenses to any allegation of infringement …[,] Cooper shall refrain from contesting the validity, enforceability, or infringement of the Subject Patents in any court of law or other forum unless Kenall asserts the Subject Patents against Cooper products other than the Subject Products." *Id*. at pp. 41-42, § 15. The License Agreement also included a "Most Favored Nation" provision, which provided that, "[i]f in the future Kenall grants to a third party another license under the Subject Patents for similar products in similar volumes at a more favorable royalty rate than that granted to Cooper," Cooper would be entitled to the more favorable rate as of the other license's effective date. *Id*. at p. 38, § 6.

After Kenall and Cooper executed the Settlement Agreement, Kenall obtained additional patents for modular lighting technology stemming from the '055 patent, including U.S. Patent No. 7,494,241 ("the '241 patent"), issued on February 24, 2009, and U.S. Patent No. 8,550,656 ("the '656 patent"), issued on October 8, 2013. Doc. 500-1 at ¶ 8; Doc. 540 at ¶ 4. The '241 patent was reissued as U.S. Patent No. RE45,563 ("the '563 patent") on June 16, 2015, and the '055 patent was reissued as U.S. Patent No. RE45,591 ("the '591 patent") on June 30, 2015. Doc. 500-1 at ¶ 8; Doc. 540 at ¶ 4.

In the present suit, Kenall alleges that, beginning in 2008, Cooper breached the License Agreement by failing to make royalty payments, failing to place the required patent notices on its products, and failing to redesign the Subject Single Product to have a one-piece end unit. Doc. 1 at ¶¶ 48-53. Kenall also alleges that Cooper infringed its patents by continuing to sell Subject Single Products after April 1, 2008. Doc. 1 at ¶¶ 48, 71-76; *see* Docs. 86-87 (reported at 338 F. Supp. 3d 841, 850-51 (N.D. Ill. 2018)) (limiting Kenall's patent infringement claim to Subject Single Products sold after April 1, 2008).

It is undisputed that Cooper sold Subject Single Products after April 1, 2008 and until 2016, when it redesigned its products. Doc. 549 at ¶¶ 17-19. Cooper applied for a patent for its redesigned HVL products on July 27, 2016, and it obtained U.S. Patent No. 10,234,109 ("the '109 patent") on March 19, 2019. *Id.* at ¶ 48.

Cooper asserted a variety of affirmative defenses, Doc. 93, which Kenall moved to strike, Doc. 95. In striking Cooper's noninfringement defense, the court held that the No Challenge Clause barred "Cooper's defense that the Subject Patents do not cover the Subject Products." Docs. 123-124 (reported at 354 F. Supp. 3d 877, 888 (N.D. Ill. 2018)). Because Cooper cannot

contest Kenall's assertion that the Subject Patents cover the Subject Products, the court determined that a *Markman* hearing was unnecessary. Doc. 201.

## Discussion

As noted, the court focuses on Cooper motion to bar Kenall's experts, Cooper's motion for summary judgment on the question whether Kenall is entitled to lost profits or a reasonable royalty rate exceeding five percent, and Kenall's motion for summary judgment on the question whether it is entitled to lost profits.

## I. Cooper's Motion to Bar Kenall's Experts

Cooper moves under Evidence Rule 702 to bar Kenall's experts. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-95 (1993); *Lees v. Carthage Coll.*, 714 F.3d 516, 521 (7th Cir. 2013) ("[T]he Daubert analysis applies to *all* expert testimony under Rule 702, not just scientific testimony.") (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)).

Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert," *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotation marks omitted), and "has 'broad latitude' to determine how to evaluate expert testimony," *United States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016) (quoting *Kumho Tire*, 526 U.S. at 153). The expert's proponent bears the burden

of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702. *See Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

### A. Francis Reid

Francis Reid is an electrical engineer who serves as a specifier for electrical lighting products. Doc. 505-2 at 3. Kenall offers Reid as an expert on the advantages of Kenall's Millenium Stretch products and whether any other products qualify as acceptable substitutes. *Id.* at 2. Based on his two decades experience specifying lighting products, Reid opines that no other product—except for Cooper's HVL products—has the same advantages stemming from the modular end structure of Kenall's Millenium Stretch. *Id.* at 4-6. The "absence of acceptable non-infringing alternatives" is a factor in the so-called *Panduit* test, which, as discussed in detail below, is one method to show that a patent holder is entitled to lost profits damages. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284-85 (Fed. Cir. 2017) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978)). Cooper contends that Reid's opinion should be excluded on several grounds.

First, Cooper argues that Reid's opinion cannot help the factfinder "determine whether something is or is not a non-infringing alternative" because he did not "analyze the patents-in-suit." Doc. 506 at 12-13. But Reid's testimony is that there is "no other product [that has] the same capabilities and advantages of [the] Millenium Stretch and the HVL product," and therefore no other "acceptable substitute." Doc. 505-2 at 6. If that is correct, then no infringement analysis is necessary to determine whether acceptable non-infringing alternatives exist. *See SmithKline Diagnostics, Inc. v. Helena Lab'ys Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991) ("Infringement or noninfringement findings [are] *not* necessary to [a] finding of acceptable substitutes. … If purchasers are motivated to purchase because of particular features of a product available only from the patent owner and infringers, products without such features would

6

obviously not be *acceptable* noninfringing substitutes."); *Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1579 (Fed. Cir. 1983) ("The dispositive determination at trial … was whether or not there was an acceptable substitute on the market.  It would be redundant to require [the plaintiff] to additionally prove either infringement or non-infringement.  Such determinations are not necessary to a determination that acceptable substitutes do or do not exist, notwithstanding what the opinion in *Panduit* says."); *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 748, 761 (N.D. Ill. 2009) ("An inability to provide the same benefits or advantages of the patented invention is sufficient to support a finding that substitutes were not acceptable.") (internal quotation marks omitted).

Second, Cooper argues that Reid's opinion is unreliable because he has not reviewed other potential alternatives, including those identified by Cooper's rebuttal expert, or conducted a market analysis or customer survey.  Doc. 506 at 13; Doc. 577 at 5-6.  That argument fails as well.  "Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."  *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000).  Reid's testimony is reliably based on his two decades of experience specifying lighting products, during which he purports to have been unable to list another acceptable substitute in public procurement bidding.  Doc. 505-2 at 6; *see Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'") (quoting Fed. R. Evid. 702); *AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *20 (S.D.N.Y. Mar. 19, 2019) (holding that the defendant's expert could opine on the existence of acceptable alternatives "based on his decades of experience in the … industry"); *U.S. Gypsum Co.*, 670 F. Supp. 2d at

761-62 (holding that the plaintiff's expert could testify, based on his industry experience, that other processes were not acceptable substitutes for the patented process because they lacked its advantages). And if Reid has in fact failed to consider products that could qualify as potential alternatives, Cooper may address that shortcoming through cross-examination or via testimony from its rebuttal expert. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("The jury must … be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony."); *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) ("Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination.") (citing *Daubert*, 509 U.S. at 596).

Finally, Reid opines that Cooper's 2016 redesigned HVL product is not an acceptable alternative to Kenall's Millenium Stretch product because it lacks "module end structures." Doc. 505-2 at 6-8. Cooper argues that this opinion is untethered to the facts of the case because, unlike Subject Continuous Products, Subject Single Products are "not modular nor used in continuous configurations." Doc. 506 at 13-14. True enough, "expert testimony is reliable only if is appropriately tethered to the facts of the case." *Sachell v. Khan*, 2022 WL 3908674, at *3 (N.D. Ill. Aug. 30, 2022) (citing *Gayton*, 593 F.3d at 616). Still, "the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) (internal quotation marks omitted).

Reid's opinion is not unreliable due to its consideration of the lack of "module end structures" in Cooper's 2016 redesigned HVL products. The Subject Patents cover a "modular lighting fixture adaptable for being implemented in various shapes and configurations."

Doc. 1-2 at 11.  As the court has held, the License Agreement's No Challenge Clause bars Cooper from arguing that "the Subject Patents do not cover the Subject Products."  354 F. Supp. 3d at 888.  Cooper accordingly cannot argue that its Subject Single Products are not "modular lighting fixture[s] adaptable for being implemented in various shapes and configurations."  Doc. 1-2 at 11.  Indeed, Cooper's drawing of its 2016 redesign of the Subject Single Products, reproduced in Reid's report, show two single units configured together. Doc. 505-2 at 7.  Cooper may, and does, argue that the modular features of the Subject Single Products do not motivate consumers to purchase the product, and therefore that products without those features can qualify as acceptable non-infringing substitutes.  But that argument simply disputes "the correctness of [Reid]'s conclusions," which is for the jury to determine.  *Stollings*, 725 F.3d at 765; *see Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992) ("The existence of a noninfringing substitute is a question of fact … .").

### B.     Brian Golden

Brian Golden held several top management roles in the commercial lighting industry from 2004 to 2018.  Doc. 506-2 at 3-4.  Kenall offers Golden as an expert on "dynamics, processes, entities, roles[,] and definitions in the lighting market."  Doc. 506-2 at 2.

Cooper argues that Golden is unqualified to opine on the market demand for Kenall's Millenium Stretch products because he is unfamiliar with Kenall's patents and "the market as it relates to single vandal-resistant fixtures."  Doc. 506 at 15-16.  But Golden's testimony concerns the meaning of industry terminology and practices, not consumer demand for specific patented products.  Doc. 506-2 at 5-14.  And "an expert witness may opine on the accepted meaning (or lack thereof) of a word or phrase within a particular industry based [on] his or her experience and training."  *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 803 (N.D. Ill. 2013) (collecting cases).

Cooper also objects to Golden's opinion as to Cooper's state of mind. Doc. 577 at 7. Golden opines that certain statements set forth in a Cooper Excel file show that "Cooper had a genuine concern that their inability to compete against Kenall's Millenium Stretch presented a genuine risk to a significant part of their institutional lighting business" and "plan[ned] to take market share away from Kenall's Millenium Stretch." Doc. 506-2 at 10-11. Expert testimony must do "more than draw[] inferences from the evidence that [the expert] was no more qualified than the jury to draw." *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991). That includes supposed expert testimony regarding a party's knowledge or intentions. *See Ploss v. Kraft Foods Grp., Inc.*, __ F. Supp. 3d __, 2022 WL 16540179, at *6 (N.D. Ill. Oct. 28, 2022) ("[T]he proponent must persuade the Court that the expert is more qualified than an ordinary juror to draw … inferences about the party's state of mind. Where the expert lacks the requisite qualifications, the expert's testimony will almost always be unhelpful because he or she is in no better position than the jury to assess [the party's] subjective intent.") (second alteration in original) (internal quotation marks and citation omitted); *United States v. Schultz*, 2016 WL 7409911, at *3 (N.D. Ill. Dec. 22, 2016) ("An expert's assertions about another person's 'intent' are neither helpful nor admissible under Rule 702.").

Although Golden is qualified to explain the meaning of terminology used in the Cooper Excel file, he admitted at his deposition that he speculated as to what Cooper intended by its statements in the file. Doc. 577-1 at 15. Golden is no more qualified than an ordinary juror to determine whether Cooper "had a genuine concern" or "plan[ned] to take market share away from Kenall[]." Doc. 506-2 at 10-11. Golden's opinion on Cooper's state of mind is accordingly excluded. *See Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997) (affirming the exclusion of an expert's opinion that the defendant "was deliberately indifferent," reasoning

that the opinion "gives the false impression that [the expert] knows the answer to this inquiry, which depends on [the defendant]'s mental state"); *Ploss*, 2022 WL 16540179, at *6-7 (holding that plaintiff's expert could not opine as to the defendant's "state of mind," including "[the defendant]'s 'knowledge or intentions'").

### C. Melissa Bennis

Kenall offers Melissa Bennis, a financial consultant, as a damages expert. Doc. 506-1 at 5-7. Cooper challenges Bennis's opinions on lost profits and a reasonable royalty. Doc. 506 at 17-22. (Because the parties ask the court to focus on patent infringement damage issues, the court does not at this time address Cooper's motion insofar as it seeks to bar Bennis's opinions on breach of contract damages or restitution. *Id.* at 22-24.)

Because Reid and Golden's opinions are admissible to the extent set forth above, Cooper's argument that Bennis's lost profits analysis should be barred because it improperly relies on Reid and Golden fails. *See Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) ("[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert … ."); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015) ("For areas outside her expertise, such as details unique to the … industry, the district court properly concluded that [the plaintiff's expert] could, indeed must, rely upon [the plaintiff]'s other experts having such industry-specific experience.").

Bennis's reasonable royalty opinion uses the "hypothetical negotiation" approach, Doc. 506-1 at 60-62, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). "A determination of the royalty stemming from a hypothetical negotiation is often made by assessing factors such as

those set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120
(S.D.N.Y.1970)." *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008). Based on
her application of the *Georgia-Pacific* factors, Bennis opines that a reasonable royalty rate in this
case is fifteen percent. Doc. 506-1 at 64-84. Cooper argues that Bennis's opinion is unreliable
because: (1) she did not consider settlement negotiations between Cooper and Kenall in 2007;
(2) her proposed fifteen percent rate is higher than the rates set by other comparable licenses she
identified; (3) she did not sufficiently explain how she arrived at a fifteen percent rate; and
(4) she failed to apportion the royalty base she used. Doc. 506 at 18-20. Those arguments fail to
persuade.

First, Cooper maintains that Bennis's opinion is flawed because it does not consider the
parties' 2007 settlement negotiations, in which Kenall allegedly sought, and Cooper declined, an
arrangement in which Cooper would pay Kenall a five percent royalty for a perpetual license for
the Subject Single Products. Doc. 506 at 18 (citing Doc. 506-8 at 2-6). The trouble with this
argument is that "Federal Rule of Evidence 408 specifically prohibits the admission of settlement
offers and negotiations offered to prove the amount of damages owed on a claim."
*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012); *see Deere &
Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1556 (Fed. Cir. 1983) (noting that the plaintiff's
second offer to grant the defendant a license "may be properly considered an offer to settle a
'claim' (patent infringement)" under Rule 408 because it "was then in dispute, both as to validity
and amount"). "Allowing a party to circumvent Rule 408 by admitting a damages number based
on a settlement offer through an expert contravenes this central public policy of favoring
settlement of disputes." *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 794328, at *9 (N.D. Cal.
Feb. 25, 2014). It accordingly was proper for Bennis to disregard Kenall's unaccepted offer

during the parties' negotiations to settle the 2007 suit. *See id.* at *8 (holding that an expert's use of settlement negotiations in her *Georgia-Pacific* analysis "runs directly into Rule 408's prohibition"); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 2012 WL 5835741, at *6 (N.D. Cal. Nov. 16, 2012) (excluding expert opinions that "rel[ied] on settlement discussions to support their damages theories"); *Maxell, Ltd. v. Apple Inc.*, 2020 WL 8269548, at *15 (E.D. Tex. Nov. 11, 2020) (holding that the defense expert was prohibited under Rule 408 "from providing testimony that relies upon the prior [settlement] offers in calculating a reasonable royalty").

Cooper also argues that Bennis's proposed fifteen percent royalty rate is untethered from the facts because it is three times higher than the five percent royalty rate that the License Agreement sets for Subject Continuous Products. Doc. 506 at 18 (citing Doc. 506-5 at 37). Bennis considered the License Agreement in her *Georgia-Pacific* analysis, but she opines that a reasonable royalty rate for the Subject Single Products would be higher than five percent because granting such a license would result in Kenall relinquishing "its exclusive right" to be the sole provider of both Subject Single and Subject Continuous Products, which Kenall sought to maintain in the License Agreement by licensing only Subject Continuous Products. Doc. 506-1 at 65-68, 83. That Cooper disagrees with Bennis's conclusion does not make her opinion unreliable for Rule 702 purposes. *See Kawasaki*, 782 F.3d at 360; *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) ("That the gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods is particularly essential in the context of patent damages. This court has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are for the jury.") (internal quotation marks omitted), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).

13

Cooper's argument that Bennis's analysis of comparable licenses is flawed because she proposes a higher royalty rate is similarly unavailing. Doc. 506 at 19. Cooper contends that Bennis's report is misleading because "the most comparable license" here is Kenall's license with H.E. Williams, which has a "0%" rate. Doc. 506 at 19. But Bennis offers her view that the H.E. Williams license is not a valid comparable because "Kenall maintained exclusivity of full modularity of the system" by agreeing to license the single modular products in exchange for H.E. Williams's agreement to discontinue its continuous modular products. Doc. 506-1 at 67 (internal quotation marks omitted). Cooper's critique of that reasoning does not make Bennis's opinion inadmissible under Rule 702. *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1331 (Fed. Cir. 2014) ("[T]he degree of comparability of the license agreements was [a] factual issue[] best addressed by cross examination and not by exclusion.") (second and third alterations in original) (internal quotation marks omitted); *i4i L.P. v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) ("Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury. The jury was entitled to hear the expert testimony and decide for itself what to accept or reject."), *aff'd*, 564 U.S. 91 (2011).

Next, Cooper submits that Bennis's reasonable royalty opinion is inadmissible because she does not sufficiently explain how she arrived at a fifteen percent rate. Doc. 506 at 19-20. In support, Cooper cites *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332 (Fed. Cir. 2018), which held that the district court erred in not excluding the expert's—in fact, Bennis's—reasonable royalty opinion "because, even assuming she properly considered th[e] record evidence, she failed to explain how the evidence factored into the proposed royalty rate." *Id*. at 1351. In so holding, the Federal Circuit explained that "[w]hen performing a *Georgia-Pacific* analysis, damages experts must not only analyze the applicable

14

factors, but also carefully tie those factors to the proposed royalty rate." *Id*. at 1350. And as the Federal Circuit has noted, "while mathematical precision is not required, some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).

Cooper argues that, as in *Exmark*, Bennis's opinion here "explained the benefits of the patented products" but did not "tie the relevant *Georgia-Pacific* factors to the [15]% royalty rate or explain how she calculated a [15]% royalty rate using these factors." Doc. 506 at 20 (quoting *Exmark*, 879 F.3d at 1349). But Cooper does not point to any specific deficiencies in Bennis's analysis. Bennis explains in detail how she arrived at a fifteen percent rate upon consideration of the *Georgia-Pacific* factors. Doc. 506-1 at 65-84. Rather than "recit[e] each factor and mak[e] a conclusory remark," *Exmark*, 879 F.3d at 1350, Bennis extensively analyzes factors one, six, nine, ten, eleven, and twelve, explaining why those factors would place upward pressure on the reasonable royalty rate, and reasoning that the rate would be higher than ███████████ ████████████████████████████████████████████████████████████████████ ████████ because Cooper is a competitor that has made "significant sales" of Subject Single Products. Doc. 506-1 at 65-68, 72-74, 76-80, 83-84.

"[E]stimating a 'reasonable royalty' is not an exact science." *Apple*, 757 F.3d at 1315. Some expert judgment is necessarily required to arrive at a reasonable rate, given that "many of the *Georgia-Pacific* factors are qualitative, not quantitative." *Plastic Omnium Advanced Innovation & Rsch. v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 414 (D. Del. 2018) (Stark, J.) (internal quotation marks omitted), *aff'd*, 943 F.3d 929 (Fed. Cir. 2019). Bennis's reasonable royalty opinion is sufficiently tied to the facts and the *Georgia-Pacific* analysis to survive Rule 702 scrutiny. *See ibid*. (holding that the plaintiff's expert sufficiently supported his reasonable

royalty opinion under *Exmark* where the expert "identified royalty rates and license offers in comparable licenses in evidence, extensively analyzed each of the *Georgia-Pacific* factors and explained when a factor might contribute to a higher royalty rate, and described which factors carried the 'greatest weight' in the hypothetical negotiation"); *Intuitive Surgical, Inc. v. Auris Health, Inc.*, 2021 WL 3662842, at *6 (D. Del. Aug. 18, 2021) (rejecting the defendant's argument that the plaintiff's expert's reasonable royalty analysis "suffer[ed] the same deficiency as the expert opinion excluded in *Exmark*," where the expert "considered 'multiple factors' in his *Georgia-Pacific* analysis to conclude that the parties to a hypothetical negotiation would move up from the rates in" comparable licenses).

Last, Cooper argues that Bennis's reasonable royalty opinion should be excluded because she failed to apportion the royalty base. Doc. 506 at 20-22. "[W]here multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *see Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 978 (Fed. Cir. 2018) ("If the product has other valuable features that also contribute to driving consumer demand—patented or unpatented—then the damages for patent infringement must be apportioned to reflect only the value of the patented feature."). "[A] demanding alternative to [the] general rule of apportionment" is "the entire market value rule," which "allows for the recovery of damages based on the value of an entire apparatus containing several features[] when the feature patented constitutes the basis for consumer demand." *Power Integrations*, 904 F.3d at 977-78 (internal quotation marks omitted); *see Virnetx*, 767 F.3d at 1326 ("[A] patentee may assess damages based on the entire market value of the accused product *only where* the patented feature creates

the basis for customer demand or substantially creates the value of the component parts.")
(internal quotation marks omitted).

Cooper argues that the entire market value rule is inappropriate here because Subject
Single Products contain other components, such a light source, besides the patented features.
Doc. 506 at 21. Although the Subject Patents cover the entire "modular lighting fixture,"
Doc. 1-2 at 11, Bennis concedes that Subject Single Products have at least some "generic and/or
conventional" features. Doc. 506-1 at 63. Cooper is correct to argue that "[w]hen a patent
covers the infringing product as a whole, and the claims recite both conventional elements and
unconventional elements," apportionment is required. *AstraZeneca AB v. Apotex Corp.*, 782
F.3d 1324, 1338 (Fed. Cir. 2015); *see Exmark*, 879 F.3d at 1348 ("[T]he patent owner must
apportion or separate the damages between the patented improvement and the conventional
components of the multicomponent product."). But the Federal Circuit has held that
apportionment in such circumstances need *not* be implemented through the royalty base; rather,
apportionment also may be implemented "through a proper analysis of the *Georgia-Pacific*
factors." *Exmark*, 879 F.3d at 1348-49; *see AstraZeneca AB*, 782 F.3d at 1338 ("[T]he standard
*Georgia-Pacific* reasonable royalty analysis takes account of the importance of the inventive
contribution in determining the royalty rate … ."). Bennis's report does so in her analysis of
*Georgia-Pacific* factor thirteen, explaining that, although she did not apportion the royalty base,
she considered apportionment in determining the royalty rate. Doc. 506-1 at 81. Cooper does
not argue that Bennis's apportionment of the royalty *rate* was improper, and thereby forfeits any
such argument. That Bennis did not also apportion the royalty base accordingly is not a reason
to bar her reasonable royalty opinion.

17

## II.     Cross-Motions for Summary Judgment on Kenall's Entitlement to Lost Profits

"Upon finding for the claimant[,] the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer … ." 35 U.S.C. § 284. Thus, "the floor for a damage award is no less than a reasonable royalty, and the award may be split between lost profits as actual damages to the extent they are proven and a reasonable royalty for the remainder." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989) (citation omitted). Both parties move for summary judgment on the lost profits issue, with Kenall arguing that it is entitled to lost profits damages as a matter of law, and Cooper arguing that Kenall is unable as a matter of law to establish an entitlement to lost profits damages. Doc. 509 at 9-14; Doc. 603 at 34-42.

"To recover lost profits damages, the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc); *see Mentor Graphics*, 851 F.3d at 1285 ("[T]he fact finder's job is to determine what would the patent holder have made (what would his profits have been) if the infringer had not infringed."). "There is no particular required method to prove but for causation." *Mentor Graphics*, 851 F.3d at 1284. The parties discuss two methods, so the court does, too.

### A.     The *Panduit* Test

The *Panduit* test, "[o]ne useful, but non-exclusive method to establish the patentee's entitlement to lost profits," *ibid.*, "requires that a patentee establish: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made."

18

*Rite-Hite*, 56 F.3d at 1545.  The parties dispute only the first two factors.  Doc. 547 at 33-37; Doc. 509 at 12-14.

### 1.    Demand for the Patented Product

"The first factor—demand for the patented product—considers demand for the product as a whole."  *Mentor Graphics*, 851 F.3d at 1285 (Fed. Cir. 2017).  According to Cooper, this factor requires the patent holder to show that an "infringing feature" of the patent "drives consumer demand" for the product.  Doc. 509 at 12 (quoting *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012)).  Cooper argues that because Kenall does not have a technical expert who evaluated the patent's claim limitations, it cannot make the required showing.  *Id.* at 12-13.

The Federal Circuit has rejected that very argument, holding that the first *Panduit* factor "does not require any allocation of consumer demand among the various limitations recited in a patent claim."  *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330 (Fed. Cir. 2009) (rejecting the defendant's argument that "the requisite demand under the first *Panduit* factor is demand for the specific feature (i.e., claim limitation) that distinguishes the patented product from a noninfringing substitute," reasoning that the argument "conflates the first and second *Panduit* factors"); *see Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1360 (Fed. Cir. 2012) ("[T]he first *Panduit* factor does not require any allocation of consumer demand among the various limitations recited in a patent claim.") (internal quotation marks omitted).  "The proper inquiry[, rather,] asks whether demand existed in the marketplace for the patented product, i.e., a product covered by the patent in suit or that directly competes with the infringing device."  *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1241 (Fed. Cir. 2017) (internal quotation marks omitted).

Cooper is wrong to argue that *Apple* rejects this approach. The Federal Circuit in *Apple* was reviewing a preliminary injunction, which under governing precedent requires a patentee to establish both "irreparable harm" and a "causal nexus relat[ing] the alleged harm to the alleged infringement." 695 F.3d at 1374. Thus, in stating that "[t]he patentee must … show that the infringing feature drives consumer demand for the accused product," the Federal Circuit was describing the causal nexus test, which does not apply here. *Id*. at 1375.

Cooper cites *Calico Brand, Inc. v. Ameritek Imports, Inc.*, 527 F. App'x 987 (Fed. Cir.), *decision clarified on reh'g*, 547 F. App'x 966 (Fed. Cir. 2013), for the proposition that "demand for the entire apparatus is, in most circumstances, not interchangeable with demand for a patented component of the larger apparatus." *Id*. at 996. In context, the Federal Circuit's observation related to the requirement that lost profits be apportioned, such that they are "tied to the intrinsic value of the patented feature." *Ibid.* The Federal Circuit subsequently held that apportionment may be accomplished through "*Panduit*'s requirement that patentees prove demand for the product *as a whole* and the absence of non-infringing alternatives." *Mentor Graphics*, 851 F.3d at 1288 (emphasis added); *see WesternGeco LLC v. ION Geophysical Corp.*, 913 F.3d 1067, 1073 (Fed. Cir. 2019) ("If the application of the *Panduit* factors does not result in the separation of profits attributable to the patented device … it appears that apportionment is necessary.").

It is undisputed that Kenall sold Millenium Stretch products and that Cooper sold Subject Single Products in competition with Kenall's Millenium Stretch products. Doc. 549 at ¶¶ 19, 40, 42. "The substantial number of sales … of infringing products containing the patented features itself is compelling evidence of the demand for the product." *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed. Cir. 1984). Although the parties dispute whether Cooper's

20

sales of Subject Single Products were "substantial," Doc. 603 at 38; Doc. 547 at 34, the record reflects a high volume of sales of both Kenall's Millenium Stretch products and Cooper's HVL products, Docs. 544-3, 544-5, 544-34, 544-35, 544-36. A jury therefore could find that there was demand for the patented product. *See Georgetown Rail*, 867 F.3d at 1241-42 ("All a patentee must do is sell[] some item, the profits of which have been lost due to infringing sales.") (alteration in original) (internal quotation marks omitted); *Presidio Components*, 702 F.3d at 1360 (holding that "substantial evidence supports the jury's finding that demand existed for" the plaintiff's product where both parties were selling similar products at high volume).

Accordingly, Cooper has not shown that no reasonable jury could find for Kenall on the first *Panduit* factor. And because the court will hold below that the second *Panduit* factor cannot be resolved on summary judgment—warranting the denial of both sides' summary judgment motions on the lost profits issue—it is unnecessary to decide whether Kenall has satisfied the first factor as a matter of law.

### 2. Absence of Acceptable Non-Infringing Alternatives

"The second factor—the absence of non-infringing alternatives—considers demand for particular limitations or features of the claimed invention." *Mentor Graphics*, 851 F.3d at 1285. "Under this factor, if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." *Id*. at 1286; *see Panduit*, 575 F.2d at 1162 ("A product lacking the advantages of that patented can hardly be termed a substitute 'acceptable' to the customer who wants those advantages."). While the "[a]vailability of lost profits is a question of law," "[t]he existence of a noninfringing substitute is a question of fact." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1372-73 (Fed. Cir. 2008) (alterations in original) (internal quotation marks omitted).

Cooper argues that Kenall cannot establish the absence of acceptable non-infringing alternatives without a technical expert who can opine on the Subject Patents' claim limitations. Doc. 509 at 13-14. However, as the court explained in denying Cooper's motion to bar Reid's expert opinion, Kenall need not prove that any alleged competing products infringe the Subject Patents if it can show that any such products are not acceptable alternatives. *See Cent. Soya Co.*, 723 F.2d at 1579; *SmithKline Diagnostics*, 926 F.2d at 1166 ("Infringement or noninfringement findings [are] not necessary to [a] finding of acceptable substitutes."). Kenall's experts (Reid and Bennis) opine that there are no acceptable non-infringing alternatives because no other product—other than Cooper's infringing Subject Single Products—has the advantages that customers desire from the modular features of Kenall's Millenium Stretch products. Doc. 505-2 at 6; Doc. 506-1 at 46-50. Because this conclusion does not require patent expertise, that Kenall's experts are not patent experts does not preclude it from establishing the absence of acceptable non-infringing alternatives. *See Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991) ("[I]f purchasers are motivated to purchase because of particular features available only from the patented product, products without such features— even if otherwise competing in the marketplace—would not be acceptable noninfringing substitutes.").

At the same time, Kenall cannot prove as a matter of law that it is entitled to lost profits because a genuine dispute exists as to whether there are acceptable non-infringing alternatives. Cooper submits that there are such alternatives, citing the deposition of James Hawkins, who testified as a Rule 30(b)(6) witness for Kenall that there are "probably ten competitors" with products similar to Kenall's Millenium Stretch products. Doc. 547 at 36-37 (citing Doc. 556-1 at 4 (148:2-148:21)). In response, Kenall asserts merely that Cooper's argument fails "to raise a

genuine issue of material fact." Doc. 569 at 21. True enough, the "mere existence of a competing device does not necessarily make that device an acceptable substitute." *Standard Havens*, 953 F.2d at 1373. But to prove "but for" causation, it was Kenall's burden to show that "purchasers are motivated to purchase because of particular features of a product available only from the patent owner and infringers" and that the "realities of the market are that other[]" competitors were not likely to "have captured sales made by the infringer." *SmithKline Diagnostics*, 926 F.2d at 1166.

In seeking summary judgment, Kenall neither explains why those competing products would not be acceptable to consumers nor attempts to establish as a matter of law that customers are motivated to purchase Millenium Stretch products or Cooper's Subject Single Products because of the patented features. Doc. 603 at 39-42. The existence of acceptable non-infringing alternatives accordingly remains a disputed fact that the court cannot resolve on summary judgment, which in turn means that the court at this juncture cannot resolve as a matter of law the broader lost profits issue. *See Aevoe Corp. v. AE Tech Co.*, 40 F. Supp. 3d 1351, 1365 (D. Nev. 2014) (denying the plaintiff's motion for summary judgment on lost profits because the defendants "provided several examples of noninfringing substitutes by numerous competitors," and the plaintiff "failed to carry its burden of establishing that the purchasers" were motivated to purchase the plaintiff's product because of the advantages of its patented features); *Malibu Boats, LLC v. Skier's Choice, Inc.*, 534 F. Supp. 3d 888, 914 (E.D. Tenn. 2021) ("The Court does not reach a conclusion on whether [the plaintiff] is entitled to lost profits, because a factual inquiry remains for the jury on whether there are acceptable non-infringing alternatives.").

In pressing the contrary result, Kenall argues that evidence that Cooper copied the Millenium Stretch products, failed to timely design its own non-infringing product, and

ultimately had to invent around Kenall's patent indicates an absence of acceptable non-infringing alternatives. Doc. 603 at 40-42. That argument fails. As an initial matter, each of those factual issues is genuinely disputed by Cooper. Doc. 547 at 35-36; *see* Doc. 549 at ¶¶ 46-49; Doc. 556 at ¶¶ 9-11. Moreover, Kenall cites no authority for the proposition that those supposed facts alone establish as a matter of law the absence of non-infringing alternatives. Rather, in the cases Kenall cites, those facts were *among* many that supported the factfinder's conclusion that alleged substitutes were not acceptable to consumers. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901-02 (Fed. Cir. 1986) (affirming the special master's lost profits determination where "the special master found many facts clearly establishing absence of acceptable substitutes," including "that none of the alleged substitutes had all beneficial characteristics of the patented device" and that the defendant "ignored those substitutes while it sold the patented invention and thus its acceptable substitute argument must be viewed of limited influence") (internal quotation marks omitted); *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996) (affirming a lost profits award where "[t]he record shows a preference for [the plaintiff]'s quality, fused silica in the market," including that "two other primary fused silica manufacturers had bowed out of the market 'in deference' to the [the plaintiff's] patent," and rejecting the defendant's argument that it "could easily have designed around the patent" where the "evidence showed it chose to copy" the plaintiff's product instead); *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003) (reversing the district court's determination that the second *Panduit* factor was not satisfied, holding that the substitute identified by the court was not available at the time of infringement, and observing that "the finding that an infringer had to design or invent around the patented technology to develop an alleged substitute weighs against a finding of availability").

Last, Kenall argues that even if it cannot establish the absence of acceptable non-infringing alternatives, it may satisfy the second *Panduit* element with a market share analysis. Doc. 603 at 39-40 (citing *State Indus.*, 883 F.2d at 1578-80). "[A] patent owner may satisfy the second *Panduit* element by substituting proof of its market share for proof of the absence of acceptable substitutes." *BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993). To do that, however, the patent owner must first "proper[ly] identif[y] … the actual market affected by the infringement." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1356 (Fed. Cir. 2001). Thus, a market share analysis can satisfy the second *Panduit* factor only if "the patent owner and the infringer compete in the same market" and all competitors in the market "s[ell] substantially similar products." *BIC Leisure Prod.*, 1 F.3d at 1219; *see Crystal Semiconductor Corp.*, 246 F.3d at 1356 ("[T]o determine a patentee's market share, the record must accurately identify the market. This requires an analysis which excludes alternatives to the patented product with disparately different prices or significantly different characteristics.").

Kenall's market share argument fails because it does not establish the pertinent market. To the contrary, Kenall's argument is set forth in a single paragraph in which it states that "Kenall was the primary competitor against the Subject Single Products." Doc. 603 at 39. This is an insufficient description of the market, particularly given Kenall's submission that it "does not seek summary judgment that the Subject Single [P]roducts and Kenall's Millenium Stretch competed in a two-player market," *id*. at 37, and because if Kenall and Cooper are the only two relevant competitors, "[t]he market share theory is irrelevant." *Mentor Graphics*, 851 F.3d at 1286 n.5 ("In a complex market with numerous competitors, a patentee may be awarded lost profit damages calculated using its market share among its competitors. The market share theory

is irrelevant in this case because the jury made a factual finding … that the relevant emulator market for sales to Intel was a two-supplier market.") (citation omitted); *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1322 (Fed. Cir. 1990) ("Patentees have successfully urged modifications to the basic damage theory so as to cover situations other than the simple two-supplier market. … [L]itigants have been held entitled to lost profits damages calculated on a portion of an infringer's sales based on the patentee's market share"); *Integra Lifesciences Corp. v. Hyperbranch Med. Tech., Inc.*, 2017 WL 11558096, at *6 (D. Del. Dec. 11, 2017) ("[T]he Federal Circuit has … recognized that when there are multiple competitors in the market, a patentee may still prove entitlement to lost profits damages from an alleged infringer[] by using a market share apportionment theory.") (citing *State Indus.*, 883 F.2d at 1577-78). Without even attempting to define the parameters of the market, Kenall cannot establish as a matter of law that the second *Panduit* factor is satisfied through the market share approach. *See Ericsson*, 352 F.3d at 1377 ("To show 'but for' causation, the patentee must reconstruct the market to determine what profits the patentee would have made had the market developed absent the infringing product. Such market reconstruction must be supported by sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture.") (internal quotation marks and citation omitted).

Kenall points to Cooper's damages expert's market share analysis, which opines that Kenall's market share would have been 27 percent of the vandal-resistant lighting fixture market, to argue that "there is no dispute" that Kenall is entitled to at least 27 percent lost profits. Doc. 603 at 39 (citing Doc. 500-8 at 3). But Kenall ignores that expert's additional opinion "that lost profits are not appropriate," and further that the expert offered a market share percentage merely to rebut the higher percentage that Bennis offered. Doc. 500-8 at 3. Indeed, Cooper's

expert's criticisms of Bennis for excluding certain manufacturers from her market share analysis—criticisms that may not be correct, but Bennis's opinion withstands Rule 702 scrutiny, so the jury will determine how to evaluate her analysis—illustrate that the record does not support finding a market definition as a matter of law. Doc. 482-1 at 53, 63.

### B.    Granular Proof of Lost Profits

As an alternative to the *Panduit* test, Kenall contends that it is entitled to summary judgment on the lost profits issue through "granular proof" that Kenall would have made additional sales but for Cooper's infringement. Doc. 603 at 37. "If there are other ways to show that the infringement in fact caused the patentee's lost profits, there is no reason why another test should not be acceptable." *Rite-Hite*, 56 F.3d at 1548. Kenall attempts to make that showing by offering one example of a situation where Cooper and Kenall bid on a project for McRae Detention and Cooper's bid was selected, resulting in sales of its Subject Single Products. Doc. 603 at 37.

This example fails to prove, at least as a matter of law, that Kenall is entitled to lost profits. Although it is undisputed that Cooper won the McRae Detention project, the competing bids included products other than Subject Single Products. Doc. 549 at ¶ 41; *see* Doc. 500-32; Doc. 500-33. Kenall does not provide any evidence indicating that Kenall lost the project to Cooper because of Cooper's infringement of Kenall's patents, as opposed to other potential factors, such as the quality of Cooper's other product offerings or McRae Detention's prior experience with Cooper. Doc. 547 at 38. Because Kenall does not establish that McRae Detention would not have chosen Cooper's bid but for the Subject Single Products' patented features, Kenall has not proved as a matter of law that it is entitled to lost profits under its granular proof approach. *See Mentor Graphics*, 851 F.3d at 1286 ("[I]f the customer would have bought the infringing product without the patented feature or with a different, non-infringing

alternative to the patented feature, then the patentee cannot establish entitlement to lost profits for that particular sale."); *Rite-Hite Corp*, 56 F.3d at 1548 ("[I]f the patent infringement had nothing to do with the lost sales, 'but for' causation would not have been proven.").

## III. Cooper's Motion for Summary Judgment on the Reasonable Royalty Issue

As noted, "[a] patentee is entitled to no less than a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits." *Rite-Hite*, 56 F.3d at 1554. "The determination of the amount of damages based on a reasonable royalty is an issue of fact." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). As also noted, a "common approach" to calculate a reasonable royalty is "the hypothetical negotiation" approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent*, 580 F.3d at 1324; *see Rite-Hite*, 56 F.3d at 1554 ("The hypothetical negotiation requires the court to envision the terms of a licensing agreement reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began.").

Cooper argues that Kenall, as a matter of law, is not entitled to a reasonable royalty rate of greater than five percent. Doc. 509 at 14-17. Specifically, Cooper contends that the royalty rate here should be limited to the five percent rate set forth in the License Agreement for Subject Continuous Products and for Subject Single Products during the redesign period because that agreement is "the most reliable license in [the] record." Doc. 584 at 13 (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010)); *see* Doc. 1-1 at p. 37, § 5.

While a jury may ultimately conclude that the License Agreement's five percent rate reflects the proper royalty in this case, that agreement—which was the product of a settlement of the 2007 litigation—does not establish that rate as a ceiling on a reasonable royalty. A variety of factors that do not relate to the underlying value of the patent, such as the "probability of losing

on validity or infringement" or "litigation costs," can affect settlement value. *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369-71 (Fed. Cir. 2017). Thus, "what bearing the amounts in [the License Agreement] ha[s] on the value of the particular patents at issue" depends on the evidence of comparability that "the jury [i]s able to evaluate … at trial." *Ibid.* For example, although the Federal Circuit in *ResQNet.com* "permitted consideration of the settlement license on remand," it "cautioned the district court to consider the license in its proper context within the hypothetical negotiation framework." *LaserDynamics*, 694 F.3d at 77 (citing *ResQNet.com*, 594 F.3d at 872).

Moreover, as held above, Bennis may opine that a reasonable royalty rate is fifteen percent, which by itself precludes holding as a matter of law that the maximum rate is five percent. *See Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1300-01 (Fed. Cir. 2019) (upholding the jury's damages award where the plaintiff's damages expert "explain[ed] the relevance of a prior settlement" to his proposed reasonable royalty rate, observing that "it was up to the jury to weigh contradictory evidence, to judge the credibility of the witnesses, and to resolve factual disputes") (internal quotation marks omitted); *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 424, 434 (D. Del. 2007) ("The experts have differing damage theories and, not surprisingly, have reached different conclusions regarding damages. The question of a reasonable royalty … [is] in dispute for the jury to decide.").

In any event, Kenall permissibly argues that the License Agreement in fact indicates that the parties would agree to a royalty rate higher than five percent in a hypothetical negotiation at the time of infringement. Doc. 604 at 22-24. Specifically, Kenall contends that the License Agreement intended to "depriv[e] Cooper of the full patented modular system that was proving

so popular for Kenall," Doc. 604 at 24, by barring Cooper from selling Subject Single Products and setting a five percent royalty rate for only a three-month redesign period, Doc. 1-1 at 36-37, §§ 2, 5. And while the License Agreement's five percent royalty rate might reflect a risk that the Subject Patents may be found invalid or noninfringed, Doc. 604 at 23, the agreement's No Challenge Clause prevents Cooper "from contesting the validity, enforceability, or infringement of the Subject Patents," Doc. 1-1 at 41-42, § 15. According to Kenall, the hypothetical negotiation would therefore differ from the negotiation leading to the License Agreement because a perpetual license for Subject Single Products would provide Cooper the ability to sell "the whole patented modular system" contrary to the compromise established by the License Agreement, and Kenall's bargaining power had been enhanced by the No Challenge Clause. Doc. 604 at 23-24; *see Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372 (Fed. Cir. 2010) (affirming a damage award that relied on the plaintiff's "testimony that in a hypothetical negotiation it would have enjoyed a strong bargaining position"); *Georgia-Pac. Corp.*, 318 F. Supp. at 1121 ("[T]he hypothetical negotiations would not occur in a vacuum of pure logic. They would involve a market place confrontation of the parties, the outcome of which would depend upon such factors as their relative bargaining strength … .").

While a jury need not accept Kenall's view, it reasonably could. Thus, a jury could reasonably conclude that the parties would have agreed to a royalty rate higher than the five percent rate set forth in the License Agreement, precluding a ruling on summary judgment that five percent is the maximum reasonable royalty. *See Apple*, 757 F.3d at 1328 ("At summary judgment … a judge may only award a zero royalty for infringement if there is no genuine issue of material fact that zero is the only reasonable royalty.").

30

In pressing the contrary result, Cooper argues that Kenall's unaccepted settlement offer to license the Subject Single Products at a five percent royalty rate without a redesign period reflects Kenall's willingness to accept a five percent rate in a hypothetical negotiation. Doc 584 at 12-13. As explained in rejecting Cooper's motion to exclude Bennis's reasonable royalty opinion, that evidence is inadmissible under Rule 408. *See LaserDynamics*, 694 F.3d at 77 ("Federal Rule of Evidence 408 specifically prohibits the admission of settlement offers and negotiations offered to prove the amount of damages owed on a claim."). And even if that evidence were admissible, Kenall raises a genuine factual dispute as to whether the License Agreement altered the parties' bargaining positions such that Kenall would not offer the same five percent rate in the hypothetical negotiation.

Cooper also argues that because the License Agreement had a "Most Favored Nation" clause, it was "guaranteed a better rate," which Cooper contends became available when Kenall licensed similar products to H.E. Williams. Doc. 509 at 16; *see* Doc. 1-1 at p. 38, § 6. This argument fails. The Most Favored Nation clause is triggered only if Kenall licensed "similar products in similar volumes." *Ibid*. Cooper does not argue, let alone present any evidence, that Kenall's license with H.E. Williams involved volumes similar to those provided for by Kenall's License Agreement with Cooper. Doc. 509 at 16.

Cooper adds that the mere presence of a Most Favored Nation clause suggests that Kenall would in the future have offered it a royalty rate more favorable than five percent. *Ibid*. But Kenall permissibly maintains that the clause is irrelevant to the hypothetical negotiation—which would license Cooper's Subject Single Products in addition to the license for Subject Continuous Products granted by the License Agreement—because Kenall has never licensed both product types to anyone. Doc. 604 at 24-25. A jury reasonably could agree with Kenall, so the Most

Favored Nation clause does not entitle Cooper to summary judgment that a reasonable royalty would not exceed five percent.

Finally, Cooper's argument that a reasonable royalty rate cannot exceed five percent because the License Agreement granted a broad license for Cooper to sell "'any other products with[in] the scope of the Subject Patents' (other than the 'Subject Products') for no royalty at all" fails as well. Doc. 509 at 15 (emphasis omitted) (quoting Doc. 1-1 at p. 36, § 1). Regardless of whether the License Agreement was broad, it specifically did not license the sale of Subject Single Products after April 1, 2008. 338 F. Supp. 3d at 850. Cooper does not explain why the license grant provision would establish that the reasonable royalty rate for Subject Single Products is necessarily lower than five percent.

## Conclusion

Cooper's motion to bar Kenall's experts' opinions is granted as to Golden's opinion on Cooper's state of mind, is entered and continued as to Bennis's opinions on breach of contract damages and restitution, and otherwise is denied. The parties' cross-motions for summary judgment as to lost profits are denied, as is Cooper's motion for summary judgment limiting a reasonable royalty rate to five percent.

December 29, 2022

_____

United States District Judge