UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KENALL MANUFACTURING COMPANY,

Plaintiff,

v.

COOPER LIGHTING, LLC and
EATON CORPORATION,

Defendants.

No. 17 CV 4575

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Kenall Manufacturing Company brought this suit against Defendants Cooper Lighting, LLC and Eaton Corporation, alleging patent infringement and breach of contract. R. 1. With discovery complete, the parties move for summary judgment on several issues and to bar testimony of certain experts. R. 474, 479, 484, 490, 496, 504, 508. Defendants also move to strike certain disclosures and documents produced by Kenall after the close of discovery. R. 644. The Court has already ruled, in part, on these issues, R. 628, and resolves the remaining issues herein. For the reasons stated below, the motions are denied in part and granted in part.

### Background

Kenall and Cooper are competing commercial lighting manufacturers. R. 540 ¶¶ 1–3; R. 549 ¶ 40. In 2012, Eaton acquired Cooper, which operates as Eaton's Lighting Division. R. 549 ¶ 4. For ease of reference, Eaton and Cooper are referred to together as "Cooper".

Kenall holds several patents on technology practiced in its Millenium Stretch lighting products. R. 540 ¶¶ 4, 8. The first, U.S. Patent No. 6,984,055 ("the '055 Patent"), issued on January 10, 2006, covers a "modular lighting fixture adaptable for being implemented in various shapes and configurations." R. 1-2 at p. 11; R. 549 ¶ 8. In 2007, Kenall sued Cooper, alleging that Cooper's Fail-Safe Harmony VR Linear Series ("HVL") lighting fixtures infringed the '055 Patent. R. 540 ¶¶ 10, 13; R. 549 ¶ 1. The parties resolved that suit pursuant to a Settlement Agreement and Confidential License Agreement (together, "Agreement"). R. 1-1; R. 540 ¶ 14; R. 549 ¶ 1. The Agreement is governed by Illinois law. R. 1-1 at p. 41, § 14. In exchange for full compliance by Cooper with the Agreement, Kenall agreed to waive its prior claims against Cooper for patent infringement. *Id.* at p. 3, § 3.

The Agreement granted Cooper "a worldwide, nonexclusive license" under the '055 Patent and any patents stemming therefrom (collectively, the "Subject Patents") to manufacture and sell Cooper's "Linear Continuous" and "Linear Single" products (respectively, the "Subject Continuous Products" and "Subject Single Products"; collectively, the "Subject Products"). *Id.* at pp. 35–36, § 1. In return, Cooper agreed to the following: to make a one-time payment of $30,000 within seven days of executing the Agreement; to pay a five percent royalty on any Subject Single Products sold from January 1, 2008 to April 1, 2008 (if the products had not been redesigned); to pay a five percent royalty on all Subject Continuous Products sold from January 1, 2008 through expiration of the last Subject Patent; to provide written reports indicating

net sales of Subject Products; and to place a patent notice on every licensed product starting December 31, 2007. *Id*. at pp. 36–39, §§ 2, 5.A, 5.B, 5.C, 7, 9.

The Agreement included a "No Challenge Clause," which provided that "Cooper does not admit infringement, validity or enforceability of the Subject Patents, and reserves all defenses to any allegation of infringement related thereto; provided, however that Cooper shall refrain from contesting the validity, enforceability, or infringement of the Subject Patents in any court of law or other forum unless Kenall asserts the Subject Patents against Cooper products other than the Subject Products." *Id*. at pp. 41–42, § 15.

After Kenall and Cooper executed the Agreement, Kenall obtained additional patents for modular lighting technology stemming from the '055 Patent, including U.S. Patent No. 7,494,241 ("the '241 Patent"), issued on February 24, 2009, and U.S. Patent No. 8,550,656 ("the '656 Patent"), issued on October 8, 2013. R. 540 ¶ 4; R. 549 ¶ 8. The '241 Patent was reissued as U.S. Patent No. RE45,563 ("the '563 Patent") on June 16, 2015, and the '055 Patent was reissued as U.S. Patent No. RE45,591 ("the '591 Patent") on June 30, 2015. R. 549 ¶ 8.

In this suit, Kenall alleges that, beginning in 2008, Cooper breached the Agreement by failing to make royalty payments, failing to mark with the required patent notices, and failing to redesign the Subject Single Product.[1] R. 1 ¶¶ 48–53. Kenall also alleges that Cooper infringed its patents by selling Subject Single

---

[1] As noted below, *infra* Part I.D, Kenall concedes that there is no independent breach of contract claim for failure to redesign.

Products after April 1, 2008. R. 1 ¶¶ 71–76; *see* R. 87 at pp. 10–14 (court order limiting patent infringement claim to Subject Single Products sold after April 1, 2008).

Cooper asserted a variety of affirmative defenses, R. 93, which Kenall moved to strike, R. 95. In striking Cooper's noninfringement defense, the court held that the No Challenge Clause barred "Cooper's defense that the Subject Patents do not cover the Subject Products." R. 124 at p. 13. Because Cooper cannot contest Kenall's assertion that the Subject Patents cover the Subject Products, the Court ruled that discovery related to claim construction and a *Markman* hearing were unnecessary. *See* R. 201. Cooper's remaining affirmative defenses are unclean hands, waiver, and failure to mitigate. R. 93; R. 124 at p. 33.

The Court ruled, in part, on the parties' motions to bar expert testimony and for partial summary judgment. R. 628. The following issues remain outstanding and will be addressed herein: Kenall's motion for summary judgment on it claims for liability and damages (excluding its arguments on lost profits, which the Court has already denied), R. 496; Cooper's motion for summary judgment (excluding its arguments on lost profits and the royalty rate, which the Court has already denied), R. 508; Kenall's motion for summary judgment on Cooper's remaining affirmative defenses, R. 490; Cooper's motion to bar Michelle Bennis' expert testimony on breach of contract damages and restitution, R. 506 at p. 18–20; Kenall's motion to bar certain expert testimony of Ken Lewis, R. 484; Kenall's motion to bar certain expert testimony of Steven Ricca, R. 474; Kenall's motion to bar certain expert testimony of Richard Conroy, R. 479; and Cooper's motion to strike and for sanctions, R. 644.

## Analysis

### I.  Motions for Summary Judgment

Summary judgment is appropriate if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). At summary judgment, the Court's function is "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court considers the evidentiary record and must view the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is not proper "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

### A.  Patent Infringement for Subject Single Products Sold After April 1, 2008

Kenall moves for summary judgment finding that the Subject Single Products sold by Cooper after April 1, 2008 infringe the Subject Patents. R. 603 at pp. 16–19. Here, there is no "genuine issue for trial," *Anderson*, 477 U.S. at 249, because the Court has already and repeatedly barred Cooper from contesting this issue.

5

There is no dispute that Cooper sold Subject Single Products after April 1, 2008,[2] R. 549 ¶ 19, that all patents asserted in this lawsuit are Subject Patents, R. 549 ¶ 8, and that the No Challenge Clause bars Cooper from contesting infringement if the Subject Patents are asserted against the Subject Products (which include Subject Single Products), R 1-1 at pp. 41–42, § 15. Cooper ignores this and argues that Kenall should have proffered an expert to conduct a claim analysis comparing the Subject Single Products to the Subject Patents. R. 547 at pp. 30–32.

The Court has already determined that "[a]ll sales of Subject Single Products after April 1, 2008 were unauthorized and therefore subject to an infringement claim." R. 87 at p. 13. The Court has also already determined that the No Challenge Clause of the Agreement bars Cooper from contesting infringement. *See* R. 124 at pp. 5–14 ("The No Challenge Clause therefore bars Cooper's noninfringement defense—that is Cooper's defense that the Subject Patents do not cover the Subject Products."). Indeed, the Court has found that, for this lawsuit, the Subject Products infringe the Subject Patents. *See* May 16, 2019 Hr'g Tr. at p. 15:5–11 ("[F]or purposes of [this] litigation, Cooper is admitting that the Subject Patents cover the Subject Products."). Cooper's argument that Kenall should proffer an expert to conduct a claim analysis disregards the Court's prior rulings.

---

[2] Cooper admits that it sold Subject Single Products after April 1, 2008 but contends that it replaced the Subject Single Products with a redesign in 2016. R. 549 ¶ 19. When the Court refers to "Subject Single Products", it means the original non-redesigned products. *See* R. 189 at pp. 9–10 (court order clarifying that "Subject Single Products" include "only the fixed set of products specifically identified in Exhibit B" of the Agreement.).Whether the redesigned products infringe the Subject Patents is not addressed here.

Consistent with its previous rulings, the Court finds that the Subject Single Products sold by Cooper after April 1, 2008 infringe the Subject Patents and grants Kenall's motion for summary judgment on this issue.[3] *See Alston v. King*, 157 F.3d 1113, 1116 (7th Cir. 1998) ("As a general principle of judicial decision-making . . . [there is] a presumption that a ruling made at one stage of the proceedings will be adhered to throughout the suit.").

## B. Breach of Contract for Subject Single Products Sold After April 1, 2008

Kenall moves for summary judgment finding that the Subject Single Products sold by Cooper after April 1, 2008 breached the Agreement. R. 603 at pp. 19–21. The Court has already analyzed the language of the Agreement with respect to this issue. *See* R. 87 at pp. 12–13. As relevant, the Court found that although Cooper's license to sell the Subject Single Products expired on April 1, 2008, "[n]o single provision in the [] Agreement expressly obligated Cooper to cease selling the Subject Single Products by April 1." *Id.* at 12. In other words, the language of the Agreement is silent with respect to Cooper's obligations after April 1 regarding the Subject Single Products. *Id.* at 12–13; *see also* R. 1-1 (the Agreement). For Kenall to bring a breach of contract claim on this issue, the Court would need to find an implied negative covenant in the Agreement that prohibits Cooper from selling the Subject Single Products after April 1, 2008.

---

[3] Kenall raises additional arguments that Cooper breached the No Challenge Clause by contesting patent infringement in this case and as part of its summary judgment briefing. R. 603 at pp. 30–32. Because the Court grants summary judgment on this issue and rejects Cooper's arguments contesting patent infringement, the Court need not reach Kenall's additional arguments.

Contract interpretation is a question of law which the Court may resolve at summary judgment. *Cont'l Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Implied covenants should not be introduced into contracts unless "absolutely necessary to effectuate the intention of the parties." *B & J Mfg. Co. v. Hennessy Indus., Inc.*, 493 F. Supp. 1105, 1132 (N.D. Ill. 1979) (internal citations omitted), *aff'd* 663 F.2d 1075 (7th Cir. 1981); *see also Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441 (7th Cir. 1992) (courts do "not lightly find implied obligations of any kind"); *Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911, 916 (Ill. App. Ct. 2004) (courts find implied covenants only where "necessary . . . in order to effect the purposes of the parties making the contract").

Here, introducing an implied covenant is not absolutely necessary to effectuate the intention of the parties. Even assuming the parties intended the Agreement to operate as an enforcement mechanism for Kenall to obtain damages if Cooper sold the Subject Single Products after April 1, Kenall already has an independent enforcement mechanism. As discussed above, Kenall's claim of patent infringement for Single Subject Products sold after April 1 has been decided in its favor. Thus, the parties' intent is effectuated absent the implied covenant. *See B & J Mfg. Co.*, 493 F. Supp. at 1132 (internal citations omitted) ("[T]he possibility of a patent infringement suit to protect [plaintiff's] rights . . . under the agreement negates any inference that the implication of such a covenant is absolutely necessary to the effectuation of the parties' intentions."). The Court thus declines to read an implied covenant into the Agreement. Absent an implied covenant, Kenall has no legal basis to support a breach

of contract claim for Subject Single Products sold after April 1, 2008. Kenall's motion for summary judgment is denied on this issue and Kenall's breach of contract claim for Subject Single Products sold after April 1, 2008 is dismissed.[4]

### C. Failure to Mark

The parties bring cross-motions for summary judgment regarding Kenall's failure to mark claim. R. 509 at pp. 17–18; R. 603 at pp. 25–30. Under the Agreement, Cooper was required to mark every Licensed Product with a patent notice starting in 2008. R. 1-1 at p. 39, § 9. There is no dispute that Cooper failed to mark the products until September 10, 2015 at the earliest. R. 549 ¶ 30. The issue is whether Kenall can demonstrate damages. *See TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) ("Merely showing that a contract has been breached without demonstrating actual damage does not suffice, under Illinois law, to state a claim for breach of contract."). As a result of Cooper's failure to mark, Kenall claims damages exclusively in the form of reputational harm. R. 603 at pp. 27–30.

Courts have consistently held that "reputational damages cannot be recovered under a breach of contract theory." *Maroon Soc'y v. Unison Consulting Inc.*, 2020 WL 5076688, at *5 (N.D. Ill. Aug. 26, 2020); *see, e.g.*, *Rice v. Community Health Ass'n*, 203 F.3d 283, 288 (4th Cir. 2000) ("Courts have universally rejected claims for damages to reputation in breach of contract actions reasoning that such damages are too speculative and could not reasonably be presumed to have been contemplated by the

---

[4] Because Kenall may not bring a breach of contract claim for Subject Single Products sold after April 1, 2008, the Court need not reach the parties' arguments regarding damages for this claim.

parties when they formed the contracts."); *Beverage Realty, Inc. v. Chatham Club, LLC*, 2003 WL 444572, at *12 (N.D. Ill. Feb. 21, 2003) ("[A] party . . . is not entitled to any damages to its reputation caused by breach of contract.").

Kenall argues that reputational damages are proper because courts have found reputational harm in claims for trademark and patent infringement. R. 603 at p. 28–29. But this is a breach of contract claim, and Kenall's citations to cases involving trademark and patent infringement claims are inapplicable. Indeed, Kenall relies on cases that analyze reputational harm in the context of injunctions, where the courts granted injunctions on the presumption that money damages were insufficient to measure or calculate reputational harm. *See, e.g.*, *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) (trademark infringement: "for the grant of a preliminary injunction to be proper, the harm to the plaintiff also must be judged irreparable—meaning not fully compensable . . . by the issuance of a final judgment."); *Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) (patent infringement: "This court finds remedies at law inadequate to compensate [plaintiff] for at least the reputation loss [plaintiff] has suffered from [defendant's] infringement."). These cases do not support the application of reputational damages to assess money damages for breach of contract, and Kenall cannot seek them here.

Even if reputational damages were available, Kenall would fail to have presented sufficient evidence to defeat summary judgment. "Where allowed, an award for damage to goodwill or business reputation must be supported by specific

evidence." *Dresser Indus., Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir. 1992). In its briefs, Kenall identifies just two pieces of evidence to support its claim for reputational harm. R. 603 at p. 29–30; R. 604 at pp. 28–29. First, Kenall presents the testimony of its 30(b)(6) witness James Hawkins, who testified that because of Cooper's failure to mark, the lighting "industry [did not] know" the Licensed Products were Kenall's which had "very significant business consequences to everybody that buys and views the product." R. 673 at pp. 3–4. Beyond this conclusory assertion, Hawkins fails to provide additional details about what these business consequences were and how they could be measured. *Id.* Kenall also asserts that Cooper won industry awards for unmarked Licensed Products. *Id.* (citing R. 500-18). Kenall's brief makes a conclusory one-sentence assertion that "but for [Cooper's failure to mark], Kenall would have benefited from the goodwill Cooper wrongfully enjoyed with respect to its Licensed Products." *Id.* at 30. This is an insufficient showing that fails to support a claim for reputational damages. *See Dresser Indus., Inc.,* 965 F.2d at 1448 ("Mere self-serving testimony is not enough to prove damage to a plaintiff's goodwill. [The witness] did not even venture to put a dollar figure on [plaintiff's] loss, much less support his testimony with concrete evidence."); *Thornbrook Int'l, Inc. v. Rivercross Found.*, 2004 WL 1718430, at *1 (N.D. Ill. July 30, 2004) (granting summary judgment on claim for reputational damages where the only evidence was testimony from plaintiff's witness that was "entirely speculative and unsupported, and thus . . . insufficient to support a claim for damages."). This lack of concrete testimony highlights why reputational damages are not allowed in

11

breach of contract cases. Cooper's motion for summary judgment is granted on the failure to mark claim brought by Kenall.

### D. Failure to Redesign

Cooper moves for summary judgment finding that Kenall cannot bring a breach of contract claim for a failure to redesign. R. 509 at pp. 18–20. Kenall concedes that there is no independent breach of contract claim for failure to redesign. R. 604 at pp. 30–31. Therefore, Cooper's motion for summary judgment is granted.

### E. Remaining Claims for Breach of Contract

As to Kenall's remaining claims for breach of contract, Kenall moves for summary judgment finding that Cooper breached the Agreement by failing to provide Kenall with written reports and that Kenall is entitled to collect interest on late royalty payments. R. 603 at pp. 21–25. On these issues, Cooper also moves for summary judgment contending that Kenall failed to mitigate. R. 509 at pp. 21–25. Under Illinois law, an injured party must "exercise reasonable diligence and ordinary care in attempting to minimize the damages after injury has been inflicted." *St. George Chicago, Inc. v. George J. Murges & Assocs., Ltd.*, 695 N.E.2d 503, 509 (Ill. App. Ct. 1998) (internal citations omitted). Where an injured party "permits his loss to be unnecessarily enhanced, the increased loss will be borne by the injured party." *Id.* In other words, a plaintiff may not recover for "consequences of defendant's act which were readily avoidable by plaintiff." *Mayster v. Santacruz*, 163 N.E.3d 246, 256 (Ill. App. Ct. 2020) (citing *Kelly v. Chicago Park Dist.*, 98 N.E.2d 738, 742 (Ill. 1951)); *see also Maere v. Churchill*, 452 N.E.2d 694, 701 (Ill. App. Ct. 1983) (claim was

12

properly dismissed on summary judgment where plaintiffs "failed to establish damages attributable to defendants" because the damages had been caused by plaintiffs' own inaction).

Under the Agreement, Cooper was obligated to "keep complete and accurate books and records sufficient to ascertain and verify the Net Sales of Licensed Products subject to royalty payments" and "within thirty (30) days after the end of each calendar-year quarter [to] provide to Kenall a written report indicating Net Sales of Licensed Products during the quarter or that there were no sales." R. 1-1 at p. 38, § 7. Cooper owed a quarterly royalty payment "due within thirty (30) days after the end of each calendar-year quarter" in the amount of "five percent (5%) of Net Sales of Subject Continuous Products sold by Cooper" from January 1, 2008 through the expiration of the Subject Patents. *Id.* at p. 37, § 5B. Cooper also owed a "one-time royalty payment" due May 1, 2008 in the amount of "five percent (5%) of Net Sales, if any, of Subject Single Products sold by Cooper" from January 1, 2008 through April 1, 2008. *Id.* at p. 37, § 5C. Cooper never provided written reports and Cooper sold both products during the relevant time period but failed to make any royalty payments. *See* R. 540 ¶ 27; R. 549 ¶¶ 23–24, 26–27. After the parties signed the Agreement in 2007, they did not communicate again until Kenall sent Cooper a letter on July 23, 2015 stating that Cooper was selling Subject Single Products in violation of the Agreement . R. 540 ¶ 27; R. 544-18. Kenall sent a follow-up letter on September 10, 2015, and for the first time, inquired into the missing royalty payments. R. 540 ¶ 28;

R. 510-5. In response to Kenall's inquiry, Cooper made royalty payments for the sales of Subject Products.[5] R. 549 ¶¶ 26–27.

Regarding the written reports and royalty payments, Kenall asserts that it is entitled to two categories of damages. First, Kenall argues that if Cooper had provided the written reports as required by the Agreement, then Kenall would have been "alerted in a *general* sense" that Cooper had breached the Agreement. R. 603 at p. 24. In turn, Kenall claims that it would have investigated "right away" and acted in 2008 to stop the infringement which "would have saved Kenall from a large amount of injury." *Id.* This is a one-sentence conclusory statement and Kenall fails to provide any method to calculate damages. In other words, Kenall lacks a "sensible basis" for this damages claim. *See Transportation & Transit Assocs., Inc. v. Morrison Knudsen Corp.*, 255 F.3d 397, 401 (7th Cir. 2001) (Although the demonstration of damages "need not be precise," the plaintiff must have "a sensible basis for its claim."). Even if Kenall could show a sensible basis for these damages, any injury resulting from delayed investigation is the direct result of Kenall's own failure to mitigate. Indeed, when Cooper breached its obligation by failing to provide the first written report in early 2008, Kenall *was* alerted in a general sense that Cooper had breached the Agreement because Kenall knew, as a function of Kenall signing the Agreement, that

---

[5] Though Cooper made royalty payments for the sale of Subject Products, Kenall contends that Cooper also should have made royalty payments for the sale of "connectors" which were integral to the Subject Continuous Products. R. 540 ¶ 28; R. 603 at pp. 43–45. Cooper has agreed to pay these royalties and disputes only the issue of interest. R. 547 at pp. 42–43. For the same reasons that Kenall is not entitled to interest for royalty payments on the Subject Products, as explained *infra*, Kenall is not entitled to interest for royalty payments on the connectors.

the due date for the written report had passed. By Kenall's own logic, if Kenall had investigated in 2008, Kenall could have prevented injury. Kenall is not entitled to now claim a "large amount of injury" when that injury could have been prevented if Kenall had acted in 2008.

Second, Kenall argues that it is entitled to interest on the late royalty payments. R. 603 at pp. 23–25. The interest, in particular, is a loss unnecessarily enhanced and a consequence readily avoidable had Kenall acted with reasonable diligence. Kenall's 30(b)(6) witness James Hawkins explained in his deposition that Kenall failed to monitor royalty payments because there were "plenty of things to be doing besides [sic] . . . tracking down small payments." R. 510-15 at p. 4. That may have been true, but Kenall's delay cannot now justify a ballooning of the "small payments" into larger ones. Kenall is not entitled to interest when Kenall allowed that interest to grow for years without acting.

There is no dispute that Kenall failed to exercise reasonable diligence and ordinary care and thus failed to mitigate.[6] Kenall signed the Agreement in 2007 and

---

[6] Kenall argues that it did not have a duty to mitigate absent "actual knowledge" of Cooper's breach. R. 604 at p. 34 (citing *Straits Fin. LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359, 375 (7th Cir. 2018)). Yet Kenall misstates the standard. In "case[s] of fraud," the duty to mitigate attaches only after a party has "actual knowledge" of the fraud; but for breach of contract claims, parties are required from the outset to exercise "reasonable diligence and ordinary care." *See Straits Fin. LLC*, 900 F.3d at 374–75. This is not a case of fraud, and Kenall does not allege fraud. *See* R. 1. But even if Kenall's duty to mitigate attached only upon actual knowledge of the breach, the facts support that Kenall had actual knowledge. Because Kenall signed the Agreement, Kenall was necessarily aware that Cooper breached when it failed to provide written reports and failed to make royalty payments for over seven years. Thus, under an actual knowledge standard, Kenall still failed to mitigate.

was therefore aware that starting within thirty days after the first quarter of 2008, it was entitled to receive written reports and—to the extent Cooper sold the Subject Projects—royalty payments. Despite radio silence from Cooper as to the reports and payments, Kenall failed to reach out for over seven years. It should have been obvious to Kenall that Cooper was required to provide quarterly reports, and if Cooper had sold Subject Products, that it was required to make quarterly royalty payments. Where Cooper clearly breached the Agreement, Kenall should have notified Cooper of the breach years earlier. Kenall is barred from recovering any damages that stem from its own failure to mitigate. *See St. George Chicago, Inc.*, 695 N.E.2d at 509. As to these issues, Cooper's motion for summary judgment is granted in that Kenall failed to mitigate damages.

### F. Affirmative Defenses

Kenall moves for summary judgment as to Cooper's affirmative defenses. R. 602. In addition to seeking summary judgment on failure to mitigate as described above, Cooper raises failure to mitigate, unclean hands, and waiver as affirmative defenses against each of Kenall's claims for breach of contract. *See* R. 551. These defenses apply only against Kenall's claims for breach of contract and not to Kenall's claims for patent infringement. As Kenall's claims for breach of contract have all been either dismissed or otherwise resolved, summary judgment as to Cooper's affirmative defenses are denied as moot.

16

### G. Convoyed Sales

Kenall moves for summary judgment asserting that it is entitled to patent damages for convoyed sales of three unpatented accessories sold by Cooper that are related to the Subject Single Products.[7] R. 603 at pp. 45–48. First, a stem that attaches to the light fixture and allows the fixture to be mounted to the ceiling. *Id.* at pp. 45–46. Second, a corner mount bracket that allows the fixture to be mounted in a corner. *Id.* at p. 47. And third, a specialized screwdriver (and its related bits) that helps with vandal-resistant installation. *Id.* at pp. 47–48.

A "convoyed sale" refers to "the relationship between the sale of a patented product and a functionally associated non-patented product." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008). "A patentee may recover lost profits on unpatented components sold with a patented item, a convoyed sale, if both the patented and unpatented products 'together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit.'" *Id.* (quoting *Rite–Hite Corp. v. Kelley Co. Inc.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995)). The products are not a functional unit if the consumer purchased the unpatented material solely the sake of convenience, aesthetic purpose, or one-stop shopping. *See id.*, 514 F.3d at 1268–69 ("The fact that customers prefer [the products] come from a single supplier for ease of purchase, repair, and uniform design and appearance, does not compel the conclusion that the [products] are . . . part of a

---

[7] Patent infringement as to the Subject Continuous Products is not at issue. *See supra* at pp. 3–4.

single functional unit."). The products are a functional unit if the unpatented material and the patented product "function together to achieve one result." *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1372 (Fed. Cir. 2004) (citing *Rite-Hite*, 56 F.3d at 1551). In *Juicy Whip*, even though "other syrups may be used in Juicy Whip's dispenser and, likewise, other dispensers could use Juicy Whip's syrups[,]" the unpatented syrup and patented dispenser functioned together to achieve one result because "[t]he dispenser needs syrup and the syrup is mixed in a dispenser." 382 F.3d at 1372. By contrast, in *Rite-Hite*, unpatented dock levelers which secure trucks to a patented truck restraint system did not function together to achieve one result because "each could effectively have been used independently of each other." 56 F.3d at 1551 ("The parties had established positions in marketing dock levelers long prior to developing the vehicle restraints.").

Kenall fails to provide sufficient evidence to support summary judgment on convoyed sales. Kenall identifies two images, yet neither of these images show how the accessories fit together with the Subject Single Products. *See* R. 569 at pp. 23–24; R. 603 at pp. 45–48. First, Kenall identifies a picture of a light fixture with holes on the bottom and asserts that the stem would be attached through the holes. R. 500-44. Significantly, the stem is missing from the picture and thus the Court cannot rely on this picture to support an inference of functionality. Second, Kenall identifies drawings on a specification sheet that show the stem and bracket as accessories for the Subject Continuous Products. R. 1-1 at p. 53. Yet Kenall seeks convoyed sales related to the Subject Single Products, so drawings related to the Subject Continuous

18

Products are not relevant. Kenall fails to identify a similar specification sheet for the Subject Single Products.

Beyond these two images, Kenall cites to various invoices from Cooper. These invoices present examples of when, as part of the same order but as separate line items, a customer purchased both the Subject Single Products and an accessory. *See, e.g.,* R. 500-45 (stem and Subject Single Product); R-500-47 (screwdriver and Subject Single Product); R-500-48 (bracket and Subject Single Product). Kenall also cites deposition testimony from Cooper's 30(b)(6) witness Mandy Timmons where Timmons confirmed that the screwdriver is "used with the [Subject Single Products]." R. 672 at p. 11. As discussed above, the fact that the patented product and accessory were purchased together or used together does not compel the conclusion that the products are part of a single functional unit. With nothing more, this evidence is thus insufficient. Kenall's motion for summary judgment as to convoyed sales is denied.

### H. Willfulness in Patent Infringement

The parties bring cross motions for summary judgment as to whether Cooper's sale of Subject Single Products after April 1, 2008 was willful patent infringement. R. 509 at 26–27; R. 603 at 32–34. Willfulness requires a finding of "deliberate or intentional infringement." *Eko Brands, LLC v. Adrian Rivera Maynez Enter., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020) ("Under *Halo*, the concept of 'willfulness' requires a jury to find no more than deliberate or intentional infringement."); *see also Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016) ("The subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced

19

damages, without regard to whether his infringement was objectively reckless."). Subjective willfulness can also be shown by proof that "the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known" to the accused infringer. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (internal citations omitted); *see also Kolcraft Enterprises, Inc. v. Chicco USA, Inc.*, 2018 WL 3329706, at *4 (N.D. Ill. July 6, 2018). Further, to establish willfulness, "a patentee must show that the accused infringer had a specific intent to infringe at the time of the challenged conduct." *BASF Plant Sci., LP v. Commonwealth Sci. & Indus. Rsch. Org.*, 28 F.4th 1247, 1274 (Fed. Cir. 2022) (citing *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021)); *see also Halo*, 579 U.S. at 105 (explaining that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct").

There is no dispute that Cooper was on notice regarding the potential for patent infringement. After Cooper signed the Agreement in 2007, Cooper was necessarily aware of the '055 Patent and the No Challenge Clause barring Cooper from contesting infringement. *See* R. 1-1. Kenall also wrote a letter to Cooper on September 10, 2015 stating that the Subject Single Products sold by Cooper were "within the scope" of Kenall's Subject Patents, including the '055, '241, '591, and '563 Patents. R. 510-5. The key factual dispute centers around whether Cooper sold the Subject Single Products with knowledge that they infringed, or whether Cooper sold the Subject Single Products but took steps to avoid infringement.

The parties identify internal Cooper documents and cherry-pick excerpts that support their respective positions. Kenall argues that these documents show knowledge of infringement. *See, e.g.,* R. 500-23 at p. 3 ("The current design is acceptable for continuous run applications, but when used for individual units, the endcap design infringes on a competitor's patent."). Cooper argues that these documents support a finding that Cooper took steps to avoid infringement. *See, e.g.*, R. 500-22 at p. 3 ("The Mid-Cap could not be used in our product due to a competitor patent, therefore it was designed out.").

The parties also submit oddly conflicting affidavits from Cooper employee John Pena. Pena was employed by Cooper from 1998 through 2010 and worked as the Director of Marketing and Product Development from 2006 through January 2009. R. 510-19 ¶ 2; R. 544-58 ¶ 3. Kenall submits an affidavit from Pena dated April 12, 2019, in which Pena attests to facts that support a finding of willful infringement. R. 544-58. For example, Pena identifies an email chain dated June 17, 2009 that refers to "individual fixtures." *Id.* at ¶¶ 14–17. Pena explains that the term "individual fixtures" refers to "stand-alone (*i.e.,* 'Subject Single Products') which Cooper had agreed to redesign." *Id.* at ¶ 14. In the email, Pena and other Cooper employees reach an "agreement" to identify the stand-alone products a certain way on a customer order, as "HVL12 BR/ER…". *Id.* at ¶ 16–17. Pena then attests: "Using the 'BR/ER' notation for the stand-alone HVL fixtures was considered an easy way to make a non-redesigned stand-alone fixture appear to be part of a run of two or more end-to-end units, *i.e.*, part of a licensed continuous fixture instead of being an

unlicensed stand-alone fixture." *Id.* at ¶ 21. Based on the affidavit submitted by Kenall, the email at issue shows that Cooper created a work-around to continue selling Subject Single Products.

Cooper submits an affidavit from Pena dated May 14, 2019, in which Pena contradicts the affidavit submitted by Kenall. R. 510-19. Pena attests that one of Kenall's attorneys threatened him into an interview and misrepresented the contents of the affidavit to Pena prior to him signing it. *Id.* at ¶¶ 4, 16–17. He attests that the "these 2009 emails reflect the Cooper team's concerted and careful efforts to comply with the 2007 Settlement and License Agreements." *Id.* at ¶ 19. He further attests: "Having now had a chance to review my prior declaration, I strongly disagree with its conclusion . . . the notation of 'BR/ER' . . . had nothing to do with the standard HVL single products. Rather it was limited to this single instance where we were to deliver 8-foot units that were seemingly single products but were in fact in-house created continuous products." *Id.* at ¶¶ 21–22. Based on the affidavit submitted by Cooper, the email at issue had "nothing to do" with Subject Single Products and thus is not evidence that Cooper created a work-around.

The parties offer conflicting interpretations of the same documents and emails and call into question the credibility of Pena bearing on critical issues of fact. Based on these contested, material facts, the parties' cross-motions for summary judgment are denied.

22

## II.     Motions to Exclude Expert Testimony

The parties move under Federal Rule of Evidence 702 to bar testimony of each other's experts. Under Rule 702, a witness may testify as an expert if their testimony: (1) will help the trier of fact to understand the evidence or to determine a fact in issue; (2) is based on sufficient facts or data; (3) is the product of reliable principles and methods; and (4) reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702. A "district court is a gate-keeper who determines whether proffered expert testimony is reliable and relevant." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal citations omitted). The Court's primary concern is "the validity of the methodology employed by an expert, not the quality of the data used . . . or the conclusions reached." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). District courts have "broad latitude to determine how to evaluate expert testimony." *United States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016) (internal citations omitted). The expert's proponent bears the burden of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). As set forth below, the majority of the arguments to exclude expert testimony go to the weight of the testimony rather than its admissibility.

23

### A. Bennis

Kenall intends to call Melissa Bennis, a financial consultant, as a damages expert. R. 506-1 at pp. 5–8. Cooper challenges Bennis's damages calculations for breach of contract regarding failure to redesign and for restitution. R. 506 at pp. 22–24. As discussed above, *supra* Part I.F, Kenall's claims for breach of contract have all been either dismissed or otherwise resolved. The damages calculations are thus no longer relevant, and the Court denies Cooper's motion on these issues as moot.

### B. Lewis

Ken Lewis is a sales associate for commercial lighting equipment who has sold lighting for a variety of infrastructure projects. R. 487-1 ¶ 2. Cooper intends to call Lewis as an expert to respond to Kenall's expert Brian Golden. *Id.* at ¶ 8. Golden works in sales and marketing for a commercial lighting manufacturer and intends to offer opinions on "dynamics, entities, roles and terminology" in the "commercial lighting industry." R. 506-2 ¶¶ 9, 11. The Court has already ruled on Cooper's motion to bar Golden's testimony. R. 628 at pp. 9–11 (allowing Golden to testify regarding market demand for Kenall's products but barring Golden's opinion as to Cooper's state of mind). Kenall challenges Lewis' opinion on multiple grounds.

First, Kenall identifies three paragraphs of Lewis' report—paragraphs 20, 36, and 37—and argues that they contain opinions not genuinely in rebuttal of Golden's report. R. 487 at pp. 4–6. A rebuttal report is proper "so long as it relates to the same subject matter" as the report it critiques. *Ernst v. City of Chicago*, 2013 WL 4804837, at *2 (N.D. Ill. Sept. 9, 2013). Upon review, the Court finds that paragraphs 20, 36,

and 37 cover the same subject matter as Golden's report—both Lewis and Golden address the benefits of Kenall's Millenium Stretch Product, the characterization of the Millenium Stretch Product as a "specification locker", and whether products that serve as specification lockers tend to "pull through" other sales.[8] *Compare* R. 487-1 ¶¶ 20, 36, 37 (Lewis' report) *with* R. 487-2 ¶¶ 15–49 (Golden's report). These paragraphs are thus appropriate for rebuttal so Kenall's motion is denied.

Second, Kenall argues that Lewis should be barred from testifying regarding the existence of specification lockers in the lighting market because Lewis' deposition testimony regarding specification lockers is inconsistent with his report. R. 487 at pp. 6–7. If this were true, Kenall's proper recourse would be cross-examination at trial rather than exclusion under Rule 702. *See Daubert*, 509 U.S. at 596. Yet Kenall's argument fails as a threshold matter because Lewis' deposition testimony is in fact consistent with his report. In his report, Lewis states that the lighting industry has "evolved away" from specification lockers and that the practice is "outdated" and "antiquated." R. 487-1 ¶¶ 12, 22, 37. And in his deposition, Lewis states that specification lockers are "a rather antiquated view of how the industry works." R. 487-3 at p. 111. Lewis then offers a hypothetical, that a specification locker could exist today for an "LED source that cures cancer" but clarifies immediately after that specification lockers would not exist with regard to the types of products at issue in this case. *Id.* at p. 112. On this point, Kenall's motion is also denied.

---

[8] A product is a "specification locker" if 1) the product is only available from one manufacturer and 2) there is proven market demand for the product due to its specific characteristics. R. 487-2 ¶ 27.

Third, Kenall argues that paragraphs 31, 36 and footnote 3 should be excluded because these paragraphs falsely imply that Lewis has prior personal experience installing the Subject Single Products. R. 487 at pp. 7–8. In paragraph 31, Lewis explains that he has placed "Cooper's FailSafe products" at various venues, but he does not specify if the products were Subject Single Products. R. 487-1 ¶ 31. In paragraph 36 and in footnote 3, Lewis provides descriptions of how the Subject Single Products are installed, but the report remains silent as to whether Lewis has prior experience installing them. *Id.* at ¶ 36 and at p. 11, n. 3. Here, Kenall's proper recourse is once again cross-examination, not exclusion. *See Daubert*, 509 U.S. at 596. On cross-examination, Kenall is free to clarify which Fail-Safe products which Lewis has personally installed and the basis for Lewis' knowledge regarding the installation process so Kenall's motion is denied.

Fourth, Kenall argues that paragraphs 30 and 32 should be excluded because they lack a factual basis. R. 487 at pp. 8–11. Yet in both paragraphs, Lewis explains that his conclusions are based on his years of personal experience in the field. *See* R. 487-1 ¶¶ 30, 32. This is a proper background to support his conclusions and Kenall's motion is denied.

Fifth, Kenall argues that Lewis' report should be excluded in entirety because the materials-considered list appended to Lewis' report (R. 487-1 at p. 26) was vague and fails to sufficiently disclose the materials considered. R. 487 at pp. 11–13. In response, Cooper argues that Kenall questioned Lewis about the materials-considered list during his deposition in May 2022 and that Kenall has not sought

26

further clarification since. R. 529 at pp. 17–18. Cooper also notes that Kenall's expert Brian Golden provided a similarly vague list. R. 529 at p. 13 n. 4. Under the Federal Rules of Civil Procedure, an expert witness must provide "the facts or data considered by the witness in forming [his opinions]." Fed. R. Civ. P. 26(a)(2)(B)(ii). Yet "[b]arring expert testimony completely is considered a harsh punishment for failing to comply with Rule 26(a)(2)(B)." *Duff v. Grandberry*, 2017 WL 1375539, at \*2 (N.D. Ill. Apr. 17, 2017). As such, the Court will allow the parties to supplement their expert's materials-considered lists with more specific disclosures. This should not be a difficult task. The parties should meet and confer in attempt to reach an agreement as to which disclosures require more specificity. Failing that, they should identify each disclosure at issue in a joint status report to the Court by April 2, 2024.

### C. Ricca and Conroy

Steven Ricca is an electrical engineer who has held multiple roles working for companies that manufacture commercial lighting. R. 477-1 ¶¶ 1–3. Cooper offers Ricca as an expert to respond to Kenall's expert Francis Reid. *Id.* at ¶ 8. Reid is an electrical engineer and intends to offer opinions on the advantages of Kenall's products. R. 505-2 ¶¶ 6, 11. The Court has already denied Cooper's motion to bar Reid's testimony. R. 628 at pp. 6–9.

Richard Conroy is a director at an economic consulting firm. R. 482-1 ¶ 1. Cooper offers Conroy as an economic expert to respond to Kenall's expert Michelle Bennis. *Id.* at ¶¶ 7–8.

27

Ricca's opinion relies on the following assertion: "[T]he crux of the Asserted Patents is modularity" and modularity is "a feature that is ***not*** present in the [Subject Single Products]." R. 477-1 ¶ 11. Based on this assertion, Ricca concludes: "[T]here are numerous options for corresponding non-infringing alternatives." *Id.* Conroy then incorporates this assertion into his report. *See, e.g.,* R. 482-1 ¶ 127. This creates a fundamental issue for both Ricca and Conroy. The Subject Patents protect "modular lighting fixture[s] adaptable for being implemented in various shapes and configurations." R. 1-2 at p. 11. As the Court has repeatedly held, the No Challenge Clause bars Cooper from contesting infringement. *See supra* Part I.A. The Court has already and specifically barred Cooper from arguing that its Subject Single Products are not modular. R. 628 at p. 9 (internal citations omitted) ("Cooper accordingly cannot argue that its Subject Single Products are not modular lighting fixtures."). As such, Ricca and Conroy will not be allowed to testify that the Subject Single Products are not modular. They will also not be allowed to testify as to any opinion that incorporates or is based on this assertion.

This assertion is entangled within both reports, but the Court is concerned that excluding Ricca and Conroy's opinions entirely would be overbroad. As such, the parties should submit a joint status report by April 2, 2024 that addresses the following: 1) whether Ricca and Conroy can reach their opinions without relying on this assertion or whether the assertion is too fundamental to be removed; 2) if possible to remove the assertion, the parties should set dates for Ricca and Conroy to submit updated reports that do not rely on this assertion. If an update is not possible, then

Ricca and Conroy's reports will be excluded in their entirety. If an update is possible, then Kenall will have the option to take an additional deposition of each expert to address the updated reports. Each deposition will be no longer than one hour and Kenall will only be allowed to address parts of the reports that have been revised.

## III. Cooper's Motion to Strike and for Sanctions

Kenall and Cooper have aggressively litigated this case for years. Kenall filed its complaint on June 20, 2017. R. 1. Fact discovery proceeded for over four years, eventually closing on August 17, 2021. R. 394. Expert discovery closed nearly a year after that on June 10, 2022. R. 470. During discovery, the parties engaged in frequent discovery disputes and filed numerous motions to compel. *See, e.g.*, R. 136, R. 192, R. 209, R. 230, R. 266, R. 274, R. 285, R. 315, R. 422. On August 15, 2023, after the close of discovery, Kenall served Rule 26(e) supplemental disclosures and produced over 700 additional documents. R. 646 at p. 7; R. 645-1; R. 645-3. Cooper moves to strike Kenall's August 15 supplemental disclosures and document production as untimely. R. 644. For the reasons stated below, Cooper's motion is denied.

Federal Rule of Civil Procedure 26 requires litigants to disclose "a computation of each category of damages claimed by the disclosing party" within 14 days after the Rule 26(f) conference. Fed. R. Civ. P. 26(a)(1). Parties are required to supplement these disclosures "in a timely manner" as more information becomes available to them. Fed. R. Civ. P. 26(e)(1). Parties are also required to supplement document production "in a timely manner" as more documents become available. *Id.* If a party fails to disclose information or documents in a timely manner as required by Rule 26,

"the party is not allowed to use that information . . . [as] evidence . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "Whether a failure to comply with Rule 26(a) or (e) is substantially justified, harmless, or warrants sanctions is left to the broad discretion of the district court." *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514 (7th Cir. 2011). In determining whether a failure to comply with Rule 26 was harmless, courts consider the following factors: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Regarding the supplemental disclosures, Cooper argues that Kenall violated Rule 26 because the disclosures present three categories of damages for which Kenall had not previously provided calculations: damages for failure to mark, price erosion, and convoyed sales. R. 646 at pp. 12–15. As ruled above, *supra* Part I.C, Kenall may not bring a claim for failure to mark, so the calculations for failure to mark are no longer relevant. At issue are the calculations for price erosion and convoyed sales. Regarding price erosion, damages for lost profits and price erosion are "inextricably linked." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1360 (Fed. Cir. 2001). Kenall sought lost profits from the outset of this case, *see* R. 1 ¶ 67 (complaint alleges lost sales), and Kenall specifically notified Cooper that it was seeking damages for price erosion in August 2019, R. 239 at p. 3, almost two years prior to the close of fact discovery. Regarding convoyed sales, Kenall stated in

30

the complaint that "Kenall's patented products are frequently sold and supplied by Kenall together with related lighting-system components for functional use" and that Kenall had been damaged by "[lost] sales of Kenall products covered by [the Subject Patents] and also including sales of other products." R. 1 ¶¶ 24, 67. Such other products that are related to the patented products for functional use fall within the scope of convoyed sales. *See Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) (Convoyed sale refers to "the relationship between the sale of a patented product and a functionally associated non-patented product.")

The factors articulated in *Caterpillar* weigh in Kenall's favor. Cooper cannot establish surprise because it has been aware, for years, that Kenall intended to seek these categories of damages. And there is no evidence of bad faith as Kenall has been up-front regarding its intent to pursue price erosion damages for years and articulated a basis for convoyed sales in the complaint. The case of *Assaf v. Trinity Med. Ctr.* is on point. 696 F.3d 681 (7th Cir. 2012). In *Assaf*, plaintiff provided a computation of damages for lost fees after the close of discovery but more than a month prior to trial. *Id.* at 686. The Seventh Circuit found that the district court abused its discretion in barring the evidence for the following reasons: 1) prior to the close of discovery, the defendant had been aware that the plaintiff intended to pursue some amount of damages for lost fees even absent the specific calculations; 2) the defendant was not prejudiced because it had more than a month to prepare before trial; and 3) the calculations were based on the defendant's own documents. *Id.* at 686–87. Each of these points is mirrored in this case. Prior to the close of discovery,

31

Cooper was aware that Kenall intended to pursue these categories of damages. Cooper will have ample time to prepare for a trial as a trial date has not yet been set. And any data related to convoyed sales comes from Cooper's own documents.

Regarding the untimely document production, Kenall asserts that the documents fall into two categories: 1) screenshots, printouts, and downloads of Cooper's own online documents; and 2) screenshots, printouts, and downloads of non-party online documents. R. 650 at pp. 12–13. Of the non-party online documents, Kenall asserts that these documents show Cooper's own lighting products as "installed *in situ* at some of the many [non-party] installation sites [Cooper has] always known of." *Id.* at p. 15. Cooper does not dispute Kenall's categorization of the documents. *See generally* R. 646 and R. 666.

Again, the factors articulated in *Caterpillar* weigh in Kenall's favor. Regarding the first factor, Cooper cannot logically claim to be surprised by its own documents or by documents showing the installation of Cooper's own products. Regarding the second factor, none of the documents are internal Kenall documents. To the extent Cooper needs additional context to understand the documents, Cooper need not depose Kenall's witnesses. Rather, Cooper has access to its own employees who have knowledge of Cooper's own documents or knowledge regarding the installation of Cooper's own products at non-party locations. Regarding the third factor, there is no trial date currently set, and Cooper has ample time to review the documents. Finally, regarding the fourth factor, there is no evidence of bad faith. Kenall asserts that it diligently searched online during the discovery period but did not identify these

documents. R. 650 at p. 15. Kenall explains that these additional documents are images without any text referring to the parties, making the documents challenging to find. *Id*. And finally, some of the documents were not available online until after the close of discovery. R. 666 at p. 6. For the foregoing reasons, Cooper's motion to strike and for sanctions is denied.

## Conclusion

As described above, the parties' cross-motions for partial summary judgment and to bar testimony of certain experts are denied in part and granted in part. Cooper's motion to strike and for sanctions is denied. By April 2, 2024 the parties shall submit a joint status report to the Court that states the following: 1) if the parties intend to renew settlement discussions in the light of the Court's rulings on summary judgment; 2) if the parties cannot reach an agreement to provide more specific disclosures for their experts' materials-considered lists, identify each disclosure at issue; and 3) set forth the parties' respective positions regarding the Ricca and Conroy expert reports. A status date will be set for April 4, 2024 at 9:15 a.m. to discuss the length of trial and to set a trial date. Because the Court already has a lengthy civil trial starting in September, this case will be set for trial by jury sometime prior to September.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: March 14, 2024